BRET O. WHIPPLE, ESQ.
Nevada Bar No. 6168
**JUSTICE LAW CENTER**
1100 S. Tenth Street
Las Vegas, NV  89104
(702) 731-0000
civil@justice-law-center.com
Attorney for Plaintiffs

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

RYAN BUNDY, individually; ANGELA BUNDY, individually; JAMIE BUNDY, individually; VEYO BUNDY, individually; JERUSHA BUNDY, individually; JASMINE BUNDY, individually; OAK BUNDY, individually; CHLOEE BUNDY, individually; MORONI BUNDY, individually; SALEM BUNDY, individually; and, RYAN PAYNE, individually,

     Plaintiffs,

vs.

UNITED STATES OF AMERICA; DOES 1 through 100; and ROES 1 through 100, inclusive,

     Defendant.

Case No.:2:23-cv-01724

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES**

   Plaintiffs Angela Bundy, Jamie Bundy, Veyo Bundy, Jerusha Bundy, Jasmine Bundy, Oak Bundy, Chloee Bundy, Moroni Bundy, Salem Bundy, Ryan Bundy, and Ryan Payne, by and through undersigned counsel, hereby file their Opposition to Defendant's Motion to Dismiss in the above-captioned matter.  Because Plaintiffs' Opposition Brief exceeds the page limit allowable under LR 7-3(c), Plaintiffs have concurrently filed a separate Motion to Exceed Allowable Page Limits, as directed under LR 7-3(c), along with a separate Declaration as noted in said rule, to facilitate the court's review of material evidence relevant to the matters currently before the court.  Accordingly, Plaintiff respectfully submits that good cause exists for filing the

instant Opposition Brief.

DATED on this 22nd day of July, 2024.

**JUSTICE LAW CENTER**

/s/ Bret O. Whipple
BRET O. WHIPPLE, ESQ.
Nevada Bar #6168
1100 S. Tenth Street
Las Vegas, NV  89104
Attorney for Plaintiffs

**POINTS AND AUTHORITIES**

**I.**

**A.  Background**

Since January 7, 1877, (13 years after Nevada was admitted into the union on equal footing with the original thirteen states on October 31, 1864), ancestors of Plaintiffs Ryan Bundy and the Bundy Family (i.e., all members of the Church of Jesus Christ of Latter Day Saints, "LDS"), migrated to this State and the Gold Butte area in Clark County, Nevada, ultimately securing deeds from the State of Nevada to land and water along the Gold Butte region. Upon that land, the Bundy family formed the Bundy Ranch as a living testimony of their family history, work ethic, pride, and patriotism - a legacy which serves as an integral part of our American history and the development of the Great Basin region throughout the Western United States.

That legacy has been handed down from generation to generation with Plaintiff Ryan Bundy learning the history and work ethic from his father, Cliven Bundy, and his own hands-on experience working at the Bundy Ranch. Plaintiff Ryan Bundy in turn, has honorably passed on that same history, work ethic, pride and patriotism to his wife and children. Over these

generations, the Bundy family has invested their blood, sweat, tears and considerable labor, materials and expense to improve the Bundy Ranch, including, without limitation, developing numerous artesian springs / aquifers on the Gold Butte Mountain Range, and securing title from the State of Nevada to the accompanying water rights.

Those springs, in turn, have served as a life force for the Bundy family's cattle that were lawfully grazing on the Bundy Ranch and its surrounding lands. Upon information and belief, as part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers, including, without limitation, the Bundy family, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes, the DOI / BLM sought to wage economic and financial warfare against the ranchers by imposing restrictive grazing restrictions and limiting the number of cattle that could graze upon those lands for the sole purpose to burden the ranchers operations until they become not viable and would be compelled to discontinue ranching.

**B.**   **Statement of Facts**

1.      Present counsel in this matter has borrowed extensively from pleadings in Case No. 2:22-cv-01039 in the District of Nevada, as the entire set of underlying facts leading up to the present opposition are the same.

2.      Present counsel has attached a Declaration related to this Opposition as **Exhibit "1".**

3.      On March 2, 2016, the United States filed a Superseding Criminal Indictment **(**Case No. 2:16-cr-0046, ECF No. 27**)** against nineteen Bundy defendants in the Underlying

Action[1] (including, without limitation, Ryan Bundy and Ryan Payne) alleging the following crimes as to each of the two mentioned Plaintiffs:

A.     Count One:  Conspiracy to Commit an Offense against the United States (18 U.S.C. 371);

B.     Count Two:  Conspiracy to Impede or Injure a Federal Officer (18 U.S.C. 372);

C.     Count Three:  Use & Carry of a Firearm in Relation to a Crime of Violence (18 U.S.C. 924(c) and (2));

D.     Count Four:  Assault on a Federal Officer (18 U.S.C. 111(a)(1), (b) and (2));

E.     Count Five:  Assault on a Federal Officer (18 U.S.C. 111(a)(1), (b) and (2));

F.     Count Six:  Use & Carry of a Firearm in Relation to a Crime of Violence (18 U.S.C. 924(c) and (2));

G.     Count Seven:  Threatening a Federal Law Enforcement Officer (18 U.S.C. 115(a)(1)(B) and (2));

H.     Count Eight:  Threatening a Federal Law Enforcement Officer (18 U.S.C. 115(a)(1)(B) and (2));

I.     Count Nine:  Use & Carry of a Firearm in Relation to a Crime of Violence (18 U.S.C. 924(c) and (2));

J.     Count Ten:  Obstruction of the Due Administration of Justice (18 U.S.C. 1503 and (2));

K.     Count Eleven:  Obstruction of the Due Administration of Justice (18 U.S.C. 1503 and (2));

L.     Count Twelve:  Obstruction of the Due Administration of Justice (18 U.S.C. 1503 and (2));

M.     Count Thirteen:  Interference with Interstate Commerce - Extortion (18 U.S.C. 1951 and (2));

---

[1]  The "Underlying Action" shall refer to *United States v. Cliven Bundy, et al.*, Case No. 2:16-cr-00046 in the U.S. District Court for the District of Nevada.

N.      Count Fourteen:  Interference with Interstate Commerce - Extortion (18 U.S.C. 1951 and (2));

O.      Count Fifteen:  Use & Carry of a Firearm in Relation to a Crime of Violence (18 U.S.C. 924(c) and (2));

P.      Count Sixteen:  Interstate Travel in Aid of Extortion (18 U.S.C. 1952 and (2));

Q.      Forfeiture – Allegation One (18 U.S.C. 2461(c));

R.      Forfeiture – Allegation Two (18 U.S.C. 2461(c));

S.      Forfeiture – Allegation Three (18 U.S.C. 2461(c));

T.      Forfeiture – Allegation Four (18 U.S.C. 2461(c));

U.      Forfeiture – Allegation Five (18 U.S.C. 2461(c));

4.      Notably, in the superseding indictment [2:16-cr-0046, ECF 27], the United States expressly represented that:

A.      "Since 1998, BUNDY was under a federal Court Order to remove his trespass cattle, an Order BUNDY refused to recognize or follow.  In 2013, a federal court issued two more Orders for removal, each declaring that in keeping with the law, the United States was authorized to seize and remove the cattle from the land in the event BUNDY refused to do so. BUNDY refused."  *Id.* at ¶ 3.

B.      In 2013, the District Court issued two Orders.  One ordered BUNDY to remove his trespass cattle permanently from the LMNRA[2] and the other reaffirmed the 1998 and 1999 Orders that required him to remove his cattle permanently from the Allotment.  Both orders declared that, in keeping with the law, the United States was authorized to seize and remove BUNDY'S trespass cattle if he did not comply with the Court's

---

[2]      "LMNRA" was defined in paragraph 32 of the Superseding Indictment to mean the Lake Mead National Recreational Area.

Orders.  One of the Orders expressly stated that BUNDY was 'not to interfere' with any removal.  *Id.* at ¶ 38.

C.    In keeping with the law and the 2013 federal Court Orders, the BLM planned to seize and remove BUNDY's trespass cattle following well-established rules and regulations governing this procedure, referred to hereinafter collectively as 'impound' or 'impoundment.'  *Id.* at ¶ 40.

5.    As detailed more specifically below, however, operative language from those Orders was omitted from the Superseding Indictment; namely, that the United States' entitlement "to seize and remove to impound any of Bundy's cattle" was expressly conditioned upon the United States first providing "notice to Bundy under the governing regulations of the United States Department of the Interior.  *See* discussion below regarding The Government's Unauthorized and Unlawful 2014 Cattle Impoundment Operation, *supra.*

6.    Namely, 43 CFR 4150.4-1(a), expressly provides that "***[a] written notice of intent to impound shall be sent via certified mail or personally delivered to the owner or his agent, or both***" - something that did not occur in this case.[3]  *Id.*

7.    Nevertheless, arrest warrants were subsequently issued and executed on the Bundy defendants, including Plaintiff Ryan Payne (**Exhibit "3",** 2:16-cr-0046, ECF No. 42) and Ryan Bundy (**Exhibit "4"**, 2:16-cr-0046, ECF No. 38).

8.    Thereafter, the nineteen (19) Bundy defendants were separated into three (3) distinct trial groups. Namely, the "Tier 1" (the alleged leadership defendants);[4] "Tier 2" (the

---

[3]    As further detailed below, the only evidence of notice of its intent to impound in March 2014, was the Government's publication of a Notice of Intent to impound that was posted in various post offices, courthouses and printed in the Mesquite Local News and the Las Vegas Review Journal – that Notice was not served upon Mr. Bundy via certified mail as required by 43 CFR 4150.1(a).

[4]    The Tier 1 group included Cliven Bundy, Ryan Bundy, Ammon Bundy, Peter Santilli and Ryan Payne.

claimed mid-level leadership defendants);[5] and "Tier 3" (the alleged "gunmen") groups.[6]  *See* Order (2:16-cr-0046, ECF No. 1098) attached hereto as __Exhibit "5"__.  The Tier 3 group proceeded to trial on February 6th, 2017; The Tier 1 trial was scheduled to commence thirty (30) days thereafter; and the Tier 2 group was scheduled to proceed thirty (30) days after the completion of the tier one trial.  *Id.*

__The Government's Unauthorized & Unlawful 2014 Cattle Impoundment Operation.__

9.     Pursuant to the Federal Land Policy and Management Act of 1976 ("FLPMA"),[7] the Bureau of Land Management ("BLM")[8] assists the Secretary of the Interior with managing the public lands[9] under principles of multiple use[10] and sustained yield.[11]  *See* 43 USC 1732.

---

[5]     The Tier 2 group included Plaintiffs Dave Bundy, Mel Bundy, Joseph O'Shaughnessy and Jason Woods, along with Brian Cavalier and Micah McGuire.

[6]     The Tier 3 group included Plaintiffs Todd Engel and Richard Lovelien, Gregory Burleson, Eric Parker, O. Scott Drexler and Stephen Stewart.

[7]     Public Law 94-579 (Oct. 21, 1976) ("An Act [t]o establish public land policy; to establish guidelines for its administration; to provide for the management, protection, development, and enhancement of public lands; and for other purposes.").  *See* 90 Stat. 2743.

[8]     The BLM was established by the Reorganization Plan Numbered 3, of 1946.  *See* 11 Fed.Reg. 7875 (July 20, 1946, 60 Stat. 1097, 5 U.S.C. App. 519); *see also* 43 USC 1731.

[9]     Pursuant to Section 103(e) of the FLPMA, "[t]he term 'public lands' means any land and interest inland owned by the United States within the several States and administered by the secretary of the interior through the [BLM], without regard to how the United States acquired ownership..." *See* 43 USC 1702(e).

[10]     Section 103(c) of the FLPMA defines "[t]he term 'multiple use' to mean the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of the resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical

10.     To that end, the BLM is responsible for, among other things, "Range Management," including, without limitation, the collection of grazing fees (43 USC 1751) and the issuance of grazing leases and permits (43 USC 1752) as provided via the Taylor Grazing Act of 1934.[12]

11.     When unauthorized grazing use has occurred on federal lands, the United States is required to follow a very specific statutory procedure before any seizure and impoundment operation can occur as mandated by 43 CFR 4150 *et seq*. - a procedure that the United States followed for an abandoned enforcement action in 2012, but *one which it knowingly did not follow for its 2014 cattle impound operation*, rendering same unauthorized and unlawful.  *See* 43 CFR 4150.1 to 4150.5.

A.     Notably, "[w]henever it appears that a violation exists and the owner of the unauthorized livestock is known, written notice of unauthorized use and order to remove lifestyle by a specified date shall be served upon the alleged violator or the agent of record, or both, by certified mail or personal delivery.  The written notice shall also allow a specified time from receipt of notice for the alleged violator to show that there has been no violation or to make settlement under § 4150.2" 43 CFR 4150.2 (Notice & Order to Remove).

B.     "Where violations are repeated willful, the authorized officer shall take action under § 4170.1-1(b) of this title." 43 CFR 4150.3 (Settlement).  Namely, "[t]he authorized officer shall suspend the grazing use authorized under a grazing permit, and whole or in part, or shall cancel a grazing permit or lease and grazing

---

values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return with the greatest unit output." *See* 43 USC 1702(c).

[11]     Section 103(h) of the FLPMA defines "[t]he term 'sustained yield' to mean the achievement and maintenance and perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use."  *See* 43 USC 1702(g).

[12]     See Pub. L .73-482; 48 Stat. 1269; 43 U.S.C. 315 *et seq*.

preference, in whole or in part, under subpart 4160 of this title for repeated willful violation[s] by a permittee or lessee of § 4140.1(b)(1) of this title.  43 CFR 4170.1-1(b) (<u>Penalty for Violations</u>).

C.   Pursuant to 43 CFR 4150.4-1(a), ***"[a] written notice of intent to impound shall be sent via certified mail or personally delivered to the owner or his agent, or both."*** (<u>Notice of Intent to Impound</u>) (Emphasis added).  The public lands or other lands under (BLM) control, or both, may be impounded in anytime after five days from delivery of the notice..."[13]

D.   "After 5 days from delivery of the notice under §4150.4-1(a) of this title or anytime after 5 days from publishing and posting the notice under § 4150.4-1(b) of this title, unauthorized livestock may be impounded without further notice anytime within the 12-month period following the effective date of [that] notice." 43 CFR 4150.4-2 (<u>Impoundment</u>).

E.   "Following the impoundment of livestock under this subpart, the livestock may be disposed of by the authorized officer under these regulations or, if a suitable agreement in effect, they may be turned over to the state for disposal.  Any known owners or agents, or both, shall be notified in writing by certified mail or by personal delivery of the sale and procedure by which the impounded livestock may be redeemed prior to the sale." 43 CFR 4150.4-3 (<u>Notice of Public Sale</u>).

F.   "Any owner or his agent, or both, or lien-holder of record of the impounded livestock may redeem them under these regulations or, if a suitable agreement is in effect, in accordance with state law, prior to the time of sale upon settlement with the United States § section 4150.3 or adequate showing that there has been no violation." 43 CFR 4150.4 (<u>Redemption</u>).

G.   "If the livestock are not redeemed on or before the date and time fixed for their sale, they shall be offered at public sale to the highest bidder by the authorized officer under these regulations or, if a suitable agreement is in effect, by the State. If a satisfactory bid is not received, the livestock may be reoffered for sale, condemned and destroyed or otherwise disposed of under these regulations, or if a suitable agreement is in effect, the accordance with State law."  43 CFR 4150.4-5 (<u>Sale</u>).

---

[13]    Unlike here, however, *"[w]here the owner and his agent are unknown, or where both a known owner and his agent refuses to accept delivery, a notice of intent to impound shall be published in a local newspaper and posted at the County Courthouse and a post office near the public land involved."* 43 CFR 4150.4-1(b) (Emphasis added).  The notice shall indicate that unauthorized livestock on the specified public lands or other lands under [BLM] control, or both, may be impounded any time after 5 days from publishing and posting the notice." *Id*.

H.     "As a precursor to any movement of cattle in Nevada, however, _the United States was required to obtain a brand inspection clearance certificate from the State of Nevada's Department of Agriculture._

1.     Pursuant to Nevada Revised Statute ("NRS") 565.010(4) and 565.030, the Nevada State Department of Agriculture "is designated as the authority to administer and carry out and enforce the provisions of this chapter and any regulations adopted pursuant thereto."

2.     A "brand inspection," under NRS 565.010(3) "means a careful visual examination of each animal offered for such inspection and a visual examination of any brands, marks or other characteristics thereon."

3.     In particular, "it is unlawful for any person to drive or otherwise remove any animals out of a brand inspection district... until the animals have been visually inspected and a brand inspection clearance certificate is issued by the Department or written permit from the Department has been issued authorizing the movement without brand inspection period.  NRS 565.090(1).

4.     Further, "it is unlawful for any person to consign for slaughter, or slaughter at an approved plant, or transfer ownership of any animals by sale or otherwise within any brand inspection district... until the animals have been visually inspected by an inspection of the department and the brand inspection clearance certificate issued covering the animals."  NRS 565.100.

5.     Moreover, when, as here, the seizure of privately owned animals by a governmental entity is involved, the securing of a court order and submission of same to the Nevada state Department of Agriculture is required **_before_** the seizure occurs.  NRS 565.125.

6.     Specifically, "if a governmental entity seizes any privately owned animals subject to brand inspection pursuant to this chapter, the department or its authorized inspector shall not issue brand inspection clearance certificates or permits to remove the animals from a brand inspection district or for the transfer of ownership of the animals by sale or otherwise unless:

(a)     Before the seizure, the governmental entity obtains approval for the seizure from a court of competent jurisdiction; and

(b)     the governmental entity submits a copy of the order approving the seizure to the Department or its authorized inspector." NRS 565.125(1).[14]

12.     The United States, seeking to enforce a judgment that it obtained in 1998 against Cliven Bundy (imposing a permanent injunction for unauthorized grazing activity on the Bunkerville Allotment and awarding monetary damages via a 1999 amendment – hereinafter "Bundy I")[15] and obtain other relief as to New Trespass Lands, initiated another lawsuit against Cliven Bundy on May 14, 2012.  *See United States v. Bundy*, Case No. 2:12-cv-0804 ("Bundy II").

13.     To that end, the United States filed a motion for summary judgment ("MSJ") in that action (Bundy 2:12-cv-0804, ECF No. 18, attached hereto as **Exhibit 6**) and, ultimately, prevailed on same (receiving a permanent injunction against Cliven Bundy as to the New Trespass Lands, an Order compelling Cliven Bundy to remove his livestock from the New Trespass Lands within 45 days, and authorizing the United States to seize and remove to impound any Bundy cattle after that time, "***provided the United States... provided notice to Bundy under the governing regulations of the United States Department of the Interior***."  *See* Order (Bundy 2:12-cv-0804, ECF No. 35) (Emphasis added).

---

[14]     Pursuant to NRS 565.170 (Penalties), "[a]ny person violating any provision of [that] chapter: (1) [i]s guilty of a misdemeanor, and upon conviction thereof shall be punished as provided by law[; and] (2) [i]n addition to any criminal penalty, shall pay to the Department an administrative fine of not more than $1,000 per violation.

[15]     *See United States v. Bundy*, Case No. cv-S-98-00531 (ECF No. 19, 45, & 46); *see also* Order (ECF No. 19) attached as Exhibit 2 to the United States' Motion to Dismiss the Engel Action (hereinafter "US Exhibit 2 – Engel").

14.     Notably, in its moving papers and supporting Declarations,[16] the United States admitted that it was required to follow the aforementioned statutory procedures, including, without limitation: providing Cliven Bundy with notice via certified mail of the United States' intent to impound his cattle; pre-impoundment notice to the Nevada State Department of Agriculture and the Clark County Sheriff; and to obtain pre-impoundment certification from the Nevada State Department of Agricultural rand inspector.  Specifically:

A.    Compliance with the notice procedure set forth in 43 CFR §§ 4150.4-5 (2005); MSJ (Exhibit 5) at 15:15-17; *see also* Rugwell Dec. (ECF No. 19-2) at ¶¶ 20-23, Notice of Trespass (Attachment K), Notice of Intent to Impound (attachment M) and Trespass Decision (attachment O) (ECF No. 19-3) collectively attached hereto as **Exhibit "7"**.

B.    Pre-impoundment notice to, and certification from, the Nevada State Department of Agriculture; See MSJ (Exhibit 5) at 15:19 to 17:05; *see also* Lueders Dec. at ¶¶ 5-12, BLM Letter (Attachment A - excluding Exhibits thereto), BLM letter (Attachment B) and State of Nevada Letter (Attachment C) (Dkt. 26-1) collectively attached hereto as **Exhibit "8"**.

C.    Pre-impoundment notice and approval from the Clark County Sheriff; see MSJ (Exhibit 6) at 17:06-13; *see also* Lueders Dec., Exhibit 7, at ¶ 13.

15.     The United States, however, did not fulfill its pre-impoundment notice requirements as evidenced by the trial testimony and various admitted exhibits during the Tier 3 and Tier 1 trials.  Namely,

A.    During its opening statement of the Tier 3 trial, the United States expressly represented to the jury that:

The BLM… had been conducting… a court-authorized impoundment to gather and remove [Cliven Bundy's] cattle from federal public lands.  *See* Trial Transcript – Day 3 (ECF No. 1608) attached hereto as **Exhibit "9"** at 6:18 to 7:01

---

[16]     Namely, the Declaration of Mary Jo Rugwell (former BLM Director for Nevada) ("Rugwell Dec.") (ECF No. 19-2 and 19-3) and Amy Lueders (the then current BLM Director for Nevada (ECF No. 26-1).

B.      On the fourth day of trial, the United States presented BLM Special Agent Rand Stover to testify, among other things, as to the notice that was actually issued by the United States regarding its April 2014 Cattle Impoundment Operation.  *See* Excerpts of Trial Transcript – Day 4 (ECF No. 1648) attached hereto as **Exhibit "10"** at 45:17 to 50:13.

C.      To that end, Mr. Stover testified that a Notice of Intent to Impound Unauthorized Livestock (Govt. Ex. 8) was posted in various U.S. Post Office locations and several Nevada State courthouses and was published in the Mesquite Local News and the Las Vegas Review Journal.  *Id.; see also* Govt. Trial Ex. 8 attached hereto as **Exhibit "11"**.

D.      Notably, the Government failed to disclose or otherwise clarify for the Court and the jury that, despite the express mandate of 43 CFR 4150.1 to 4150.5, ***the Government's Notice of Intent to Impound was not sent to Cliven Bundy via certified mail***.

16.      During the Tier 1 trial, the Government similarly misled the Court and the jury during its Opening Statement as to the legality of its impairment operation; namely, notwithstanding the express mandate to provide the requisite statutory notices, the United States noted that:

A.      We all are aware, in our own common experience, where we've read or heard where someone -- you know, someone goes to court, and they have a claim, and their side gets heard. The other side gets heard. They present evidence. They present argument standing in front of a judge or a jury like I am today, and the Court decides the matter.

And when they render that decision, when the Court renders that decision, that results in an order of the Court.  And that order from the Court is, in fact, the law of that case. It decides the dispute and tells the parties what to do.

So, we all have heard of, you know, A sues B, because B owes money to A. The Court says, B pay A.  That's an order.  And it's expected that that order be followed. That's how we maintain peace. That's how we maintain order in our communities. That's how our system of government is set up.

The orders are not advisory. They are not there to suggest things. They are there to be followed.

And if the order is not followed, you can expect that a law enforcement officer of one type or another will get involved to enforce the order. Because if there was no enforcement of an order, the orders would not be worth the paper they are written on. Again, that's how we maintain the peace.  That's how we maintain order in our communities.

So, we have all read or heard of someone who hasn't followed an order, and maybe a sheriff's officer or a police officer has to go in and seize property to sell to pay a debt, or evict a tenant who hasn't paid rent, or tear down a fence that the Court has Ordered it should be torn down because of some violation of one thing or another.

So, when that law enforcement officer executes that order, the law protects that officer.  Protects that officer so that the officer can conduct his or her duties without interference, without impediment.  And it is a crime to obstruct the execution of a Court order.

It is a crime to interfere, impede, or intimidate a law enforcement officer from executing the order that has been issued from the Court.  And it is a crime to use force and violence in order to impede, intimidate, or interfere with that officer as they execute the orders of the court.

Trial Transcript Day 6 (ECF No. 2884) at 27:25 to 28:16 attached hereto as **Exhibit "12"**.

B.   "We will cover the sequence of events for you, the Court orders, and the plan to gather the cattle.  Then I'd like to cover the threats that were leveled, the interference, and the false messaging that occurred in order to bring militia into Nevada." *Id*. at 34: 04-08.

C.   "So, with new Court orders in hand, BLM then proceeded to plan to gather the cattle." *Id*. at 39:12 to 40:13.

D.   "And we will prove to you that the property was in the possession, lawful possession of the BLM.  That they had gathered the cattle over the course of the days between the 2nd and April the 12th." *Id*. at 83:22 to 84:01.

17.   During the Government's case-in-chief with the Tier 1 trial, the United States presented U.S. Department of Justice Environment & Natural Resources Division Attorney Terry Petrie who addressed the four historical Court Orders leading up to the 2014 Cattle Impoundment Operation (i.e., the 1998 Order relating to the Bunkerville Allotment; the 1999

1    modification thereto; and the 2013 Orders authorizing the Government to seize and impound any

2    trespassing cattle on the Bunkerville Allotment and New Trespass Areas provided the

3    Government complied with the governing regulations of the United States Department of

4    Interior).  Trial Transcript – Day 9 (ECF No. 2902) attached hereto as **Exhibit "13"** at 77:24 to

5    78:11, 99:01-07, 107:09 to 108:11, 112:18 to 113:11, 115:11-23, 117:08 to 120:25, 121:11-23,

6    127:03 to 128:07.

7        18.    Mr. Petrie, however, did not disclose nor did the United States elicit any

8    testimony as to the government's non-compliance with 43 CFR 4150 *et seq*. and the need for a

9    Notice of Intent to impound being served upon Cliven Bundy via certified mail as a precursor to

10   the Government's 2014 Cattle Impound Operation.  *Id*.

**The United States Concealment of Government Snipers**

11       19.    During the Tier 3 trial, the United States expressly represented to the jury in its

12   opening statement and its theme throughout its case-in-chief that:

A.    "The BLM officers were on the worst ground possible.  They were in a ditch.  The terrain acted like a funnel and they were at the bottom of it. They were in the open.  There was no natural cover or concealment, only their vehicles to provide them with protection.  And the gunmen moved to the high ground; they had the superior position."  *See* trial transcript - Day 3 (ECF No. 1608), Exhibit 8 at 7:18 - 8:01.

B.    "But, most of all, it was the tactical positions of the gunmen: the high ground in the wash, the northbound bridge above the officers' position. And these are the defendants, ladies and gentlemen, who sit before you today. They are the gunmen on the high ground and the gunmen on the bridges that faced off with those officers that day and that wash on April the 12th, 2014."  *Id*. at 9:19-24.

C.    "You will hear how Bundy joined forces with others to recruit the militia... You will hear the pitch that they made over the Internet.  You will hear how they referred to the BLM officers as 'the aggressors' and 'the trespassers'; how they said the BLM was abusing the Bundy family members, surrounding their house, making them shelter in place, pointing guns at them, stealing their cattle."  *Id*. at 15:02-10.

D.  "It was all false; it was all fake.  But they didn't care and neither did they who answered the call to arms that followed."  *Id.* at 15:17-18.

E.  "But, in the final analysis, all of that said, this case is really very, very simple; it's a very simple case.  This case is about these defendants on that bridge and on the high ground on April the 12th.  The evidence will show that these law enforcement officers were doing their jobs.  They were where they were supposed to be when they were supposed to be there doing what they were supposed to be doing, what two court orders authorized them to do.  These defendants interfered with them.  They intimidated them.  They threatened their lives. They forced them to leave their posts.  They threatened. They intimidated. They interfered." Id. at 21:18 - 11: 03.

20.  On days 7 and 8 of the Tier 3 trial, the Government presented then-BLM Law Enforcement Ranger Logan Briscoe regarding his observations and involvement with the 2014 Cattle Impoundment Operations.  *See* Trial Transcript Excerpts – Day 7 (ECF No. 1663), attached hereto as **Exhibit "14",** at 4:09 to 5:11.  Mr. Briscoe was assigned as the team lead or supervisor for Security of the Incident Command Post ("ICP"), a holding area and a lookout post / observation post ("LPOP") above the Toquop Wash.  *Id.* at 5:18-25, 8:22 to 9:03.  Specifically, several officers were located at the LPOP location with "binoculars or spotting scopes" for "surveillance purposes." *Id*. at 9:23 to 10:21.

21.  During cross-examination on Day 8, Mr. Briscoe expressly denied the existence of snipers located on the ridgeline above the Toquop Wash.

Q:  Did they have - did you have snipers up on the ridge?  Is that fair to say?

A:  No, we did not.

Trial Transcript Day 8 (ECF No. 1672) attached hereto as **Exhibit "15"** at 113:10-12.

22.  Based upon the Tier 3 groups failure to "introduce more than a scintilla of evidence" suggesting that the "agents actions constituted an excessive use of force" or that "their response to the agents' actions [were] objectively reasonable," the District Court denied Mr.

Engel's and the Tier 3 Defendants request for self-defense, defense of others, excessive force and justification instructions. *See* Trial Transcript Excerpts - Day 27 attached hereto as **Exhibit "16"** at 142:16 to 151:17.

23.     The United States carried the same theme as to the absence of government snipers through the Tier 1 trial.

24.     Notably, in its opening statement, the government expressly stated

> "And the messaging that was put out by the Bundys, by the Bundys and their supporters, was that this was BLM being a large army that was coming to attack them, was coming to interfere with them, was coming to abuse them. And you will hear how the messaging transformed from stealing cattle to now they've got snipers aimed at us. Not they've got our house surrounded. Now we can't move. We've got the shelter in place. We can't do anything because the BLM has got us surrounded.

> And that was false... " Trial Transcript - Day 6 (ECF No. 2884), Exhibit 12 at 49:08-16.

**Evidence of the Government's Intentional Withholding of Exculpatory *Brady* Materials, the Destruction/Spoliation of Other Evidence & Collection of Privileged Attorney-Client Telephone Calls**

25.     In late October to early November 2017, the existence of a Whistleblower Complaint filed by BLM Special Agent / Lead Investigator Larry Wooten ("Wooten 1") surfaced - one acknowledging multiple violations of the Bundy Defendants' civil and constitutional rights by law enforcement officers in connection with the United States' arrest, detention and prosecution of the Bunny Defendants, including Mr. Engel.

26.     Specifically, in a document entitled "Disclosure and Complaint Narrative in Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and Associated Cover ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in Reference to the Cliven Bundy Investigation," (hereinafter "Whistleblower Complaint"), Mr.

Wooten exposed the Governments Employees' conspiracy and their unlawful unconstitutional conduct.  See Wooten I attached hereto as **Exhibit "17"**; See also Bundy Amended Complaint (ECF No. 11) at ¶ 105.

27.   Notably, Mr. Wooten revealed, among other things, that

A.   There was a "widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.A.

B.   The "issues amongst law enforcement supervisors in our agency made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators and ignored the letter and intent of the law." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.B.

C.   "The issues [he] uncovered ... also likely put [the DOI / BLM] and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.C.

D.   This was "the largest and most expansive and important investigation ever within the Department of Interior." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.D.

E.   BLM SAC Love "specifically took on assignments that were potentially questionable and damaging (such as document shredding, research, discovery email search documentation and as the affiant for the Dave Bundy iPad Search Warrant) ... [Mr. Wooten felt like BLM SAC Love] wanted to steer the investigation away from misconduct discovery ..." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.E.

F.   "The misconduct caused considerable disruption in our workplace, was discriminatory, harassing and showed clear prejudice against the defendants, their supporters and Mormons." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.F.

G.   "Oftentimes this misconduct centered on being sexually inappropriate, profanity, appearance/body shaming and likely violated privacy and civil rights." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.G.

H.    There were "potentially captured comments in which [DOI / BLM] law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck to his face" as a result of his unlawful arrest. *Id.*; *see also* Bundy Amended Complaint at ¶ 106.H.

I.    "On two occasions, [Mr. Wooten] overheard [BLM SAC Love] tell [another DOI / BLM assistant special agent in charge] that another/other BLM employee(s) and potential trial witnesses didn't properly turn in the required discovery material likely exculpatory evidence." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.I.

J.    BLM SAC Love "even instigated the unprofessional monitoring of jail calls between defendants and their wives, without prosecutor or FBI consent, for the apparent purpose of making fun of post arrest telephone calls ...." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.J.

K.    BLM SAC Love sought "to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible. Additionally, this investigation also indicated excessive use of force, civil rights and policy violations." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.K.

L.    BLM SAC Love was not regularly updating the U.S. Attorney's Office "on substantive and exculpatory case findings and unacceptable bias indications" and, as such, [Mr. Wooten] personally informed ... Acting United States Attorney Steven Myhre and Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of Investigation (FBI) Special Agent Joel Willis by telephone of these issues." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.L.

M.    For example, Mr. Wooten advised AUSA Myhre that when Dave Bundy was arrested "on April 6, 2014, the BLM ... the BLM SAC and others were told not to make any arrests" (i.e., they had no arrest authority) and that BLM SAC Love made exculpatory statements that would need to be disclosed to the defense team including, without limitation, "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and BLM SAC Love's directive to DOI / BLM officers "to get the troops fired up to go get those cows and not take any crap from anyone" – statements which AUSA Myhre acknowledged would need to be disclosed but never were. *Id.*; *see also* Bundy Amended Complaint at ¶ 106.M.

N.    On February 18, 2017, when Mr. Wooten "was removed from [his] position, ... [BLM SAC Love] conducted a search of [Mr. Wooten's] individually occupied secured office and secured safe within that office. During that search, ... [BLM SAC Love] without notification or

19

permission seized the Cliven Bundy/Gold Butte Nevada Investigative 'hard copy' Case File, notes (to include specific notes on issues [Mr. Wooten] uncovered during the 2014 Gold Butte Nevada Trespass Cattle Impound and 'lessons learned') and several computer hard drives that contained case material, collected emails, text messages, instant messages, and other information." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.N.

O.     Following this seizure outside of [Mr. Wooten's] presence and without [his] permission, [BLM SAC Love] did not provide any property receipt documentation (DI- 05/Form 9260-43) or other chain of custody documentation (reasonably needed for trial) on what was seized." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.O.

P.     Mr. Wooten "was also aggressively questioned [by BLM SAC Love] about who [Mr. Wooten] had told about the case related issues and other severe issues uncovered in reference to the case and [BLM SAC Love]." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.P.

Q.     Mr. Wooten also notes that he was "convinced that [he] was removed to prevent the ethical and proper further disclosure of severe misconduct, failure to correct and report, and cover-ups ...." including, without limitation, "civil rights violations and excessive use of force." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.Q.

R.     To that end, Mr. Wooten identified "the loss/destruction of, or purposeful non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014, April 9, 2014, April 12, 2014 - the most important and critical times in the operation)."[17]  *Id.*; *see also* Bundy Amended Complaint at ¶ 106.R.

---

[17]     In a subsequent email from Mr. Wooten to (now former) DOJ Office of the Inspector General Attorney Mark Masling (who was tasked with investigating this matter *after* the Underlying Action was dismissed), Mr. Wooten noted that there was a "dumpster of shredded BLM documents."  Further, as detailed in the accompanying Declaration of Warren Markowitz (Mr. Engel's post-trial / appellate counsel) during a phone call that he had with Mr. Wooten, Mr. Wooten identified a follow-up memorandum that he authored in which Mr. Wooten further detailed, among other things:  multiple civil and constitutional law violations against the Bundy Defendants; the United States' intentional withholding / non-disclosure of exculpatory *Brady* information (e.g. surveillance-camera evidence, FBI "302" investigative reports regarding snipers, Tactical Operations Center or "TOC" log records and threat assessments); and flagrant misconduct by the Government agents, including, without limitation, the prosecutors assigned to the case ("Wooten II").  *See* Markowitz Dec., Exhibit B, at ¶ 7; *see also* Wooten II attached thereto as Exhibit 3.

S.      Tellingly, Mr. Wooten concluded that he "believe[d] these issues would shock the conscious of the public and greatly embarrass [the BLM] if they were disclosed." *Id.*; *see also* Bundy Amended Complaint at ¶ 106.S.

28.      Around that same time, a BLM Office of the Inspector General ("OIG") Report surfaced – one apparently holding BLM Special Agent in Charge of the Cattle Impoundment Operation (Dan Love) guilty of misconduct in an unrelated matter[18] along with evidence of the Government's (a) improper recording, retention and non-disclosure of privileged attorney-client communications between the Bundy Defendants and their counsel;[19] (b) the delayed production of surveillance evidence of the Bundy's residence, Tactical Operations Center Activity Logs, FBI Nevada Joint Terrorism Task Force Reports, Southern Nevada Counterterrorism Center Threat Assessments, FBI Behavioral Analysis Unit Threat Assessments, Gold Butte Cattle Impound Risk Assessment, a Law Enforcement Operations Order, and (c) the destruction of surveillance recordings and notes thereof, and evidence of the existence of government snipers.[20]

---

[18]      On October 18, 2017, Tier I Bundy Defendant Ryan Payne filed a Motion to Dismiss the Underlying Action Under Seal (ECF No. 2727) – a Motion which remains sealed and not part of the public record for undersigned counsel to review, reference or otherwise attach).  Several Tier 1 Bundy Defendants joined that Motion, however, and the general topic (i.e., the existence of an OIG Report involving BLM Special Agent Dan Love is referenced in those Joinders.  *See generally*, Joinders at ECF Nos. 2728-2732, 2734-2737, 2739, 2741, 2750, 2758).

[19]      *See* Motion to Dismiss With Prejudice Due to Collection of Privileged Attorney-Client Phone Calls (ECF No. 2842) and Joinders thereto (ECF No. 2860, 2861, 2863, 2864).

[20]      *See* Motion to Dismiss Based on Discovery Provided on November 17, 2017 (ECF No. 2883) and Joinders thereto (ECF Nos. 2925); *see also* Motion to Dismiss for Continuing Patterns of Brady and Other Discovery Violations (ECF No. 2959) and Joinders thereto (ECF Nos. 2961, 2963, 2992, 2995-2997).

29.     These two matters prompted the Bundy Defendants to file a series of Motions to Dismiss[21] requests for evidentiary hearings concerning the United States' failure to disclose this (and other) exculpatory Brady evidence and its intentional withholding of other relevant and material evidence relative to the non-existence of probable cause related to the Government's decision to arrest, detain and prosecute all Bundy Defendants.  *See* Motions to Dismiss for Prosecutorial Misconduct (ECF Nos. 2828, 2842, 2856, 2883, 2959), Joinders thereto (ECF Nos. 2833 – 2835, 2837, 2840, 2865).

30.     On December 20, 2017, Judge Navarro granted the Bundy Defendants' Motion for a Mistrial (ECF No. 2856) and various Motions to Dismiss (ECF Nos. 2916, 2924, and 2925) based upon the Government's multiple Brady violations and failure by the Government to timely disclose relevant evidence.  *See* Minutes (ECF No. 3041).

31.     In support of her ruling, Judge Navarro expressly noted as follows:

A.      "Thus, the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, citing *United States v. Sudikoff*, which is a Central California case." Trial Transcript Day 16 (ECF No. 3049) attached hereto as **Exhibit "18"** at 5:22 – 25.

B.      The prosecutor's duty to disclose material evidence favorable to the defense is applicable, even though there has been no request by the accused, and it encompasses impeachment evidence as well as exculpatory evidence, citing *Strickler v. Greene*.  *Id*. at 6:20-24.

C.      In the case of the late disclosure of favorable evidence, the Court looks at whether the evidence was revealed in time for the defendant to make use of it, citing *Bielanski v. County of Kane*.  *Id*. at 6:25-7:03.

D.      For claims under Brady, the prosecutor's personal knowledge does not define the limits of constitutional liability. Brady imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of other agencies as well. Brady suppression occurs when

---

[21]     Certain Motions remain sealed and not part of the public record for undersigned counsel to review (e.g. EFT No. 2906).

the government fails to turn over even evidence that is known only to police investigators and not to the prosecutors themselves, citing *Youngblood v. West Virginia*, which is quoting *Kyles v. Whitley*, and also *Browning v. Baker*.  *Id*. at 7:08-16.

E.     The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody, or control of any federal agency participating in the same investigation of the defendant, citing *United States v. Bryan*…Ninth Circuit case.  *Id*. at 7:17-21.

F.     <u>Surveillance Materials, FBI Law Enforcement Operation Order, FBI 302 Reports & FBI TOC Logs</u>

"The Court does find that this information is favorable to the accused and potentially exculpatory. It does bolster the defense and is useful to rebut the Government's theory.  The evidence of a surveillance camera, its location, the proximity to the home, and that its intended purpose was to surveil the Bundy home as opposed to incidentally viewing the Bundy home, *<u>this information potentially rebuts the allegations of the defendants' deceit which is repeated in the superseding indictment numerous times, including the conspiracy count as an overt act in allegations number 59, 84, 88, and 92 regarding false representations that were alleged about the Bundys being surrounded, about the BLM pointing guns at them, and using snipers</u>*."  *Id*. at 8:23 to 9:10 (Emphasis Added).[22]

"Now, the Court also finds that the disclosure was willful. And, remember, it doesn't matter for this purpose whether it's willful or inadvertent, but the Court does analyze that and wants to provide that information to the parties. The Court does find that it was a willful disclosure/suppression of this potentially exculpatory, favorable, and material information because all of the documents were prepared by the FBI. The operation order was prepared by the FBI on March 28th of 2014, and the FBI 302 report about the interview with Egbert was prepared by the FBI. And it reveals that the FBI SWAT team placed the surveillance camera, repaired it, relocated it, and that the FBI monitored the live feed from the camera."  *Id*. at 9:16 to 10:2.

"Also, the U.S. Attorney's Office was aware of the camera, at least the latest information based on the Ryan Bundy interview…. And, further, *<u>the</u>*

---

[22]     Specifically:  <u>paragraph 88</u> of the Superseding Indictment (ECF No. 27) expressly references that Ryan Payne "used the internet and other facilities in interstate commerce to recruit gunmen and others to travel to the Bundy Ranch for the unlawful purpose of interfering with impoundment operations, stating falsely, among other things, that the Bundy Ranch was surrounded by BLM snipers, that the Bundy family was isolated, and that the BLM wanted BUNDY dead."

_Government falsely represented that the camera view of the Bundy home was incidental and not intentional, and claimed that the defendants' request for the information was a fantastic fishing expedition_." _Id._ at 10:03-13 (Emphasis Added).

"So the Court does find that this information provided in those documents is favorable to the accused and potentially exculpatory. It does bolster the defense and is useful to rebut the Government's theory. For example, the March 3rd, 2015, 302 prepared by the FBI provides information regarding BLM individuals wearing tactical gear, not plain clothes, carrying AR-15s assigned to the LPOP on April 5th and 6th of 2014, which bolsters the defense because it potentially rebuts the indictment's allegations of overt acts, including false pretextual misrepresentations that the Government claims the Defense made about snipers, Government snipers, isolating the Bundy family and defendants using deceit and deception to normally recruit gunmen." _Id._ at 11:20 to 12:07.

"The next group is the unredacted FBI TOC log. The Court does find that this is favorable information, potentially exculpatory. It bolsters the defense and is useful to rebut the Government's theory. More specifically, it provides information about the family being surveilled by a camera, and specifically lists three log entries using the word "snipers," including snipers being inserted and that they were on standby." _Id._ at 13:06 to 13:12.

"This information, had it been timely provided, would have been potentially useful to the Defense to rebut the indictment's overt acts, specifically the allegations regarding false pretextual misrepresentations being made by defendants about Government snipers isolating the Bundy family." _Id._ at 13:13-17.

G.    Threat Assessments

Moving on now to the subject of threat assessments.  There was a threat assessment that was provided. However, there are numerous other threat assessment reports that were not provided. We have the 2012 FBI BAU Threat Assessment; also 2012 Southern Nevada Counterterrorism Threat Assessment; the third one is the March 24th, 2014, FBI order; fourth, we have the Gold Butte Impoundment Risk Assessment; and the BLM OLES Threat Assessment.

The Court does find that these provide information that is favorable to the accused and potentially exculpatory. The information does bolster the defense and is useful to rebut the Government's theory.

Specifically, turning first to the 2012 FBI BAU Threat Assessment. That document provided favorable information about the Bundys' desire for a nonviolent resolution. The 2012 Southern Nevada Counterterrorism Threat Assessment noted that the BLM antagonizes the Bundy family, giving the community an unfavorable opinion of the Federal Government, and that they are trying to provoke a conflict, and that the likelihood of violence from Cliven Bundy is minimal.

…

All of this information undermines the Government theory and the witness testimony about whether the Bundys actually posed a threat in relation to the 2012 and 2014 cattle impoundment operations and whether the BLM acted reasonably. It is both exculpatory evidence and potentially impeachment information, and it was not provided before October 30th of 2017.

The Court does find that there was a willful failure to disclose the information…." *Id.* at 16:04 – 17:22.

32.     On January 8, 2018, Judge Navarro held a Hearing to address whether the mistrial she declared and the dismissal of the Government's Superseding Indictment should be "with" or "without prejudice."

33.     At the time, after considering the briefs submitted by the parties, Judge Navarro expressly held, among other things, that:

A.     "A district court may dismiss an Indictment on the ground of outrageous government conduct if the conduct amounts to due process violation," *See* Hearing Transcript (ECF No. 3122) attached hereto as **Exhibit "19"** at 8:18-21 (*quoting* United States v. Simpson, 813 F.2d 1462 (9th Cir. 1991); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.A.

B.     "To violate due process, governmental conduct must be ... 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *Id.* at 9:01-05 (*quoting United States v. Restrepo*, 930 F.2d 705 (1991); *United States v. Ramirez*, 710 F.2d 535 (9t h Cir. 1983)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.B.

C.     "Outrageous government conduct occurs when the actions of law enforcement officers or informants are so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 9:09-16 (*quoting United States v. Archie*, 2016 WL 475234 (D.Nev. 2016), *cert denied*, 2019 WL 5152784

(9th Cir. 2019); *United States v. Black*, 733 F.3d 294 (9th Cir. 2013); *United States v. Russell*, 411 U.S. 423 (1973)); *see also* Bundy Amended Complaint (ECF No.11) at ¶ 109.C.

D.    "[D]ismissal under this 'extremely high' standard is appropriate only in 'extreme cases in which the government's conduct violates fundamental fairness.'" *Id.* at 9:17-21 (*quoting U.S. v Pedrin*, 797 F.3d 792 (9th Cir. 2015); *United States v. Smith*, 924 F.2d 889 (9th Cir. 1991)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.D.

E.    "So, when reviewing a claim alleging that the Indictment should be dismissed because the government's conduct was outrageous, evidence is viewed in the light most favorable to the government." *Id.* at 9:22 to 10:01 (*citing United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.E.

F.    "The concept of outrageous government conduct focuses on the government's actions." *Id.* at 10:02–3 *(citing United States v. Restrepo*, 930 F.2d 705 (1991)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.F.

G.    "Here in this case, both the prosecution and the investigative agencies are equally responsible for the failure to produce *Brady* materials to the defense." *Id.* at 10:04-06; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.G.

H.    The Court finds the prosecution's representations that it was unaware of the materiality of the Brady evidence is grossly shocking." *Id.* at 10:13-15; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.H.

I.    "[T]he government was well aware that theories of self-defense, provocation and intimidation might become relevant if the defense could provide a sufficient offer of proof to the Court. However, the prosecution denied the defense its opportunity to provide favorable evidence to support their theories as a result of the government's withholding of evidence and this amounts to a *Brady* violation." *Id.* at 10:22 to 11:11; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.I.

J.    "[T]he prosecutor has a duty to learn of favorable evidence known to other government agents, including the police, if those persons were involved in the investigation or prosecution of the case." *Id.* at 11:07–11 (*citing Kyles v. Whitley*, 514 U.S. 419 (1995); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.J.

K.    "Clearly, the FBI was involved in the prosecution of this case." *Id.* at 11:12; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.K.

L.      "Based on the prosecution's failure to look for evidence outside of that provided by the FBI and the FBI's failure to provide evidence that is potentially exculpatory to the prosecution for discovery purposes, the Court finds that a universal sense of justice has been violated." *Id.* at 11:13–17; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.L.

M.      Alternatively, a district court may exercise its supervisory powers in three different enumerated ways: Number one, 'to remedy unconstitutional or statutory violation[s]'; number two, 'to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury'; or number three, 'to deter future illegal conduct." *Id.* at 11:24 to 12:06 (quoting *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.M.

N.      "In *United States vs. W.R. Grace*," 504 F.3d 745 (9th Cir. 2007) "the Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to these three grounds enumerated in *Simpson* ...." *Id.* at 11:24 to 12:07-10; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.N.

O.      "'Dismissal is appropriate when the investigatory or prosecutorial process has violated a federal Constitution or statutory right and no lesser remedial action is available.'" *Id.* at 12:11-14 (*quoting U.S. v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.O.

P.      "The Ninth Circuit has recognized that exercise of a supervisory power is an appropriate means of policing ethical misconduct by prosecutors." *Id.* at 11:15-18 (*citing U.S. v. Lopez*, 4 F.3d 1455 (9th Cir. 1993)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.P.

Q.      "So 'dismissal under the Court's supervisory powers for prosecutorial misconduct requires both: 'Number one, flagrant misbehavior, and number two, substantial prejudice.'" *Id.* at 12:19-23 (*quoting United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.Q.

R.      "Neither accidental nor mere negligent governmental conduct is sufficient. The idea of prejudice entails that the government's conduct had at least some impact on the verdict and thus rounded to the defendant's prejudice." *Id.* at 12:24 to 13:02; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.R.

S.      "In Order for the Court to dismiss an Indictment under the supervisory powers, the Court must find that there has been flagrant prosecutorial

misconduct, substantial prejudice to the defendants, and that no lesser remedial action is available." *Id.* at 13:03- 06; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.S.

T.   "So the Court looks to *Chapman*, *U.S. v. Chapman*." [524 F.3d 1073 (9th Cir. 2008)] ... The district court in *Chapman* found that the 'Assistant U.S. Attorney acted flagrantly, willfully and in bad faith' and that he had made 'affirmative misrepresentations to the Court,' and that the defendants would be prejudiced by a new trial and that no lesser standard would adequately remedy the harm done after reviewing the totality of the proceedings before it." *Id.* at 14:8, 14:12-18; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.T.

U.   "The Ninth Circuit held that the *Chapman* court did not abuse its discretion by dismissing the Indictment pursuant to its supervisory powers." *Id.* at 14:10- 21; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.U.

V.   "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair and impartial trial. His interest in a particular case is not necessarily to win, but to do justice.'" *Id.* at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.V.

W.   "[T]he fact that the prosecution failed to look beyond the files provided by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to learn and seek out favorable evidence. The prosecution's reliance on the FBI to provide the required information *amounted to an intentional abdication of its responsibility*." *Id.* at 16:11-16 (Emphasis Added); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.W.

X.   "Thus, the Court does find that there has been flagrant prosecutorial misconduct in this case ...." *Id.* at 19:09-10[23]; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.X.

Y.   "The Court is troubled by the prosecution's failure to look beyond the FBI file that was provided and construes the Brady violations in concert as a reckless disregard of its discovery obligations. The government's

---

[23]   With regard to the prejudice resulting from the government's recent production of BLM Officer Wooten's Whistleblower Complaint, Judge Navarro was troubled by his "abrupt removal…in February 2017, allegedly by the prosecution because he complained of Special Agent in Charge Dan Love's misconduct, the investigating law enforcement officer's bias, the government's bias, and the failure to disclose exculpatory evidence." Transcript, Exhibit A-23, at 19:23 – 20:05.

recklessness and the prejudice the defendants will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment because no lesser sanction would adequately ... deter future investigatory and prosecutorial misconduct." *Id.* at 20:14-21; *see also* Bundy Amended Complaint (ECF No. at. 11) at ¶ 109.Y.

Z.    "[The government's] conduct has caused the integrity of a future trial and any resulting conviction to be even more questionable. Both the defense and the community possess the right to expect a fair process with a reliable conclusion. Therefore, it is the Court's position that none of the alternative sanctions available are as certain to impress the government with the Court's resoluteness in holding prosecutors and their investigative agencies to the ethical standards which regulate the legal profession as a whole." *Id.* at 20:23 to 21:07; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.Z.

AA.    "The Court finds that the government's conduct in this case was indeed outrageous, amounting to a due process violation, and that a new trial is not an adequate sanction for this due process violation." *Id.* at 21:08-11 (Emphasis Added); *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.AA.

BB.    "Even if the government's conduct did not rise to the level of a due process violation, the Court would nonetheless dismiss under its supervisory powers because there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ... Number one, to properly remedy the constitutional violation; number two, to protect judicial integrity by ensuring that a conviction rests only on appropriate considerations validly before a jury; and number three, to deter future illegal conduct." *Id.* at 21:12-16, 21:20-24; *see also* Bundy Amended Complaint (ECF No. 11) at ¶ 109.BB.

34.    Based upon the foregoing, Judge Navarro dismissed the Government's Superseding Indictment with Prejudice (See Judgment of Dismissal (ECF No. 3117)) and the United States subsequently appealed same to the Ninth Circuit Court of Appeals.

35.    On August 6, 2020, the Ninth Circuit Court of Appeals issued a unanimous panel decision affirming the District Court's judgment dismissing the Superseding Indictment with prejudice due to the Government's multiple Brady violations.  *See* Opinion (ECF No. 139-1) attached hereto as **Exhibit "20".**

36.     Notably, the Ninth Circuit concluded that:

"Central to the government's case where the allegations that the defendants intentionally lied about being surrounded by snipers as a ploy to gather armed supporters.  Had defendants been able to proffer a basis for genuinely believing that government snipers surrounded the Bundy ranch, they potentially could have negated the government's scienter theory.  Surveying all of the withheld evidence - including surveillance camera evidence, FBI '302' investigative reports regarding snipers, Tactical Operation Center (TOC) log records, and threat assessments - the panel held that the record amply supports the district court's conclusion that the defendants suffered substantial prejudice in not being able to prepare their case fully, refine their voir dire strategy, and make stronger opening statements." *Id.* at p.3.

The prosecution withheld facially exculpatory evidence that directly negated the government's theory that the defendants lied about fearing snipers. The deliberate choices to withhold these documents were not cases of simple misjudgment, especially given that doubt about the helpfulness of evidence should be resolved in favor of disclosure. *Id.* at p. 46.

**Request for Judicial Notice**

37.     Pursuant to Fed.R.Evid. 201 and *Reyn's Pasta Bella, LLC v. USA, Inc*., 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public records"), Plaintiffs respectfully request that the Court also take judicial notice of the following exhibits:

| Exhibit | Description | Docket No. |
|---------|-------------|------------|
| 2 | Superseding Indictment | ECF No. 27 |
| 3 | Arrest Warrant Executed – Ryan Payne<br>Case No. 2:16-cr-00046 | ECF No. 42 |
| 4 | Arrest Warrant Executed – Ryan Bundy<br>Case No. 2:16-cr-00046 | ECF No. 38 |
| 5 | Order Filed December 12, 2016<br>Case No. 2:16-cr-00046 | ECF No. 1098 |
| 6 | U.S. Motion for Summary Judgment<br>Case No. 2:12-cv-00804 | ECF No. 18 |

| | | | |
|---|---|---|---|
| 7 | Declaration of Mary Jo Rugwell<br>Case No. 2:12-cv-00804 | ECF No. 19-2, 19-3 |
| 8 | Declaration of Amy Lueders<br>Case No. 2:12-cv-00804 | ECF No. 26-1 |
| 9 | Partial Trial Transcript dated February 9, 2017<br>Case No. 2:16-cr-00046 | ECF No. 1608 |
| 10 | Trial Transcript Excerpts dated February 13, 2017<br>Case No. 2:16-cr-00046 | ECF No. 1648 |
| 11 | Government Trial Exhibit 8<br>Case No. 2:16-cr-00046 | |
| 12 | Trial Transcript Excerpts dated November 14, 2017<br>Case No. 2:16-cr-00046 | ECF No. 2884 |
| 13 | Trial Transcript Excerpts dated November 20, 2017<br>Case No. 2:16-cr-00046 | ECF No. 2902 |
| 14 | Trial Transcript Excerpts dated February 16, 2017<br>Case No. 2:16-cr-00046 | ECF No. 1663 |
| 15 | Trial Transcript Excerpts dated February 27, 2017<br>Case No. 2:16-cr-00046 | ECF No. 1672 |
| 16 | Trial Transcript Excerpts dated April 10, 2017<br>Case No. 2:16-cr-00046 | ECF No. 2001 |
| 17 | Disclosure and Complaint Narrative in Regard to<br>Bureau of Land Management Law Enforcement<br>Supervisory Misconduct and Associated Cover-ups<br>As well as Potential Unethical Actions, Malfeasance<br>And Misfeasance by United States Attorney's Office<br>Prosecutors from the District of Nevada (Las Vegas)<br>In Reference to the Cliven Bundy Investigation<br>("Wooten I") – 18-10287 (Ninth Circuit) | ECF No. 72-1 |
| 18 | Hearing Transcript dated December 20, 2017<br>Case No. 2:16-cr-00046 | ECF No. 3049 |
| 19 | Hearing Transcript dated January 8, 2018<br>Case No. 2:16-cr-00046 | ECF No. 3122 |
| 20 | Ninth Circuit Court of Appeals Opinion (Tier 1) | ECF No. 139 |

31

Case 18-10287

## II.

## LEGAL ANALYSIS

## DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED.

### A.   Rule 12(b)(1) Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on the basis that the court lacks jurisdiction over the subject matter of the action. The burden is on the plaintiff to establish that the court has subject matter jurisdiction over the action. *Assoc. of Med. Colls. v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000).  Rule 12(b)(1) is a "proper vehicle for invoking sovereign immunity from suit."  *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015).

A Rule 12(b)(1) jurisdictional attack may be facial or factual. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

The Plaintiffs have shown clearly that they are seeking civil relief against BLM and FBI officers, and not against the Department of Justice and/or its employees, in this matter.  BLM Officers, FBI employees, and other executive agency employees fall outside the gambit of the

1  intentional tort exception of the FTCA, and thus, Plaintiffs respectfully the court deny the

2  Defendant's motion on these grounds.

3  **B.  <u>Rule 12(b)(6) Standard</u>**

4      Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to

5  state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to state a claim

6  for relief, a pleading "must contain ... a short and plain statement of the claim showing that the

7  pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper

8  only where there is no cognizable legal theory or an absence of sufficient facts alleged to support

9  a cognizable legal theory." Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1041

10  (9th Cir. 2010).

11      "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

12  accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

13  U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim

14  has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

15  reasonable inference that the defendant is liable for the misconduct alleged." Id. However, "a

16  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

17  labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

18  do." Twombly, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is

19  not "required to accept as true allegations that are merely conclusory, unwarranted deductions of

20  fact, or unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.

21  2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual

22  content, and reasonable inferences from that content, must be plausibly suggestive of a claim

23  entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).

Plaintiffs have shown that all of their causes of action against the Defendants have been pled with sufficient particularity, and furthermore, have provided sufficient facts in both their Statement of Facts section herein and specific facts listed in the actual causes of action themselves.  Therefore, Plaintiffs respectfully request the Court deny Defendant's motion to dismiss this matter based upon FRCP 12(b)(6) grounds.

### SUMMARY OF THE MOTION TO DISMISS ARGUMENTS AND ARGUMENTS AGAINST

1)   The intentional tort exception to the FTCA's waiver of sovereign immunity precludes the Plaintiff's ability to bring this matter forward.

This argument fails.  The intentional tort exception applies "only" to the United States Attorney's office (AUSA).  Here, the Plaintiff agrees to dismiss the FTCA claims against the United States Attorneys Ahmed, Myhre and Bodgen.  However, the malicious prosecution claims against FBI Special Agent Joel Willis; BLM Special Agent ("SAC") Daniel Love; and BLM officers Rand Stover and Mark Brunk, and their fellow employees (collectively, the "Government Employees") remain.  It is also hereby agreed henceforth that the term "Government Employees" does not include any member of the United States Attorney's office.

2)   The Malicious Prosecution Claim regarding FBI and BLM conduct is deficiently plead due to the following reasons: (i) the presumption of independent prosecutorial judgment; (ii) the FAC did not plead facts of a favorable termination and (iii) the FAC did not plead facts showing a lack of probable cause.

Each of these arguments fail.  As shown below, (i) the FAC did plead facts that satisfied the requirements of malicious prosecution against the Defendant's Government Employees (Willis, Love, Stover and Brunk).  (ii) The FAC did plead facts of a favorable termination, in that the District Court Judge dismissed the indictment against the Plaintiff's prior to any conviction, and (iii) the FAC did plead facts showing a lack of probable cause as described in Awabdy v. City of Adelanto, 368 F.3d 1062.

34

3)      The Intentional Infliction of Emotional Distress (IIED) fails due to a jurisdictional requirement and due to deficient pleading.

     These arguments also fail because the FAC did, in fact, properly plead the independent actions of the Government Employees (Willis, Love, Stover, & Brunk).  And the elements of IIED are contained within the FAC.

4)      If the claims of false arrest; false imprisonment, malicious prosecution and IIED are denied, the claim of Loss of Consortium must also be denied.

     This claim fails due to the fact that the Plaintiff's claim in the FAC (as discussed below) must remain.

**III.**

**<u>LEGAL ARGUMENT</u>**

**1.**      **<u>THE INTENTIONAL TORT EXCEPTION</u>**

     28 U.S.C. 2680 bars FTCA claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights" unless such claims are with regard to acts or omissions of investigative or law enforcement officers of the United States Government.  The statute further defines investigative or law enforcement officer as "any officer of the United States who is empowered by law to execute searches, to seize evidence or to make arrests for violation of Federal law." *Id*.   The Court has interpreted this provision to "not" include federal prosecutors, because they are not empowered to execute searches, seize evidence, or make arrests.  *See Manansingh v. United States*, 2023 WL 2658753 (9th Cir. March 28, 2023).

     Here, the Plaintiff's acknowledge that federal prosecutors Ahmed, Myhre and Bodgen will "not" be included as part of the group identified as "Government Employees" as plead in the FAC.  However, the "Government Employees" that do remain and are rightfully included in the

claims under the FTCA include Willis, Love, Stover and Brunk.  Surely, the Government is not arguing that FBI Special Agent Joel Willis, BLM Special Agent ("SAC") Daniel Love, BLM officers Rand Stover and Mark Brunk, and their fellow employees, are not "investigative or law enforcement officers" as it seems certain that they routinely execute searches, seize evidence and make arrests.  Therefore, the FAC is properly pled as to the investigative or law enforcement officers remaining once the federal prosecutors are no longer included.

## 2.  THE MALICIOUS PROSECUTION CLAIM

### A.  Presumption of Independent Prosecutorial Judgment.

In the underlying matter, multiple federal agencies were involved in the cattle roundup and the events of April 2014.  These ultimately included (at a minimum) the Bureau of Land Management (BLM), the United States Park Service and the Federal Bureau of Investigation (FBI).   These multiple agencies shall hereinafter be referred to as the "Law Enforcement Agencies."  The United States Attorney's office is a separate entity from these Law Enforcement Agencies.   The FAC, paragraphs 29 through 46 identify the interaction between the federal prosecutor and the Law Enforcement Agencies.  The FAC paragraphs 29–30 refer to some of the interaction between these Law Enforcement agencies.

The Defendant makes the novel argument that because the federal prosecutor is granted immunity "and" they were involved in a supervisory position with the Law Enforcement Agencies, that any actions taken by the Law Enforcement Agencies must also be granted immunity.  This jump to a legal conclusion however, is not supported by any authority or caselaw.

Here, one only need refer back to 28 U.S.C. 2680(h) which specifically excludes from immunity "any officer of the United States who is empowered by law to execute searches, to

seize evidence, or to make arrests for violations of Federal law."  Each one of these actions would necessarily involve the assistance and/or supervision of the federal prosecutor.  In fact, it is expected that a federal prosecutor would be assisting and supervising federal officers.  If immunity were to extend to federal officers who were being assisted, supervised or even controlled by a federal prosecutor, the immunity doctrine would have clarified that issue.  Here, the clear reading of 28 U.S.C. 2680(h) allows for suit against an officer of the United States.  In this matter, Willis, Love, Stover and Bunk are all officers and are therefore "not" covered by immunity allowed for in 28 U.S.C. 2680.

Lastly, Defendant states that the FAC's allegations establish that *every* act that led to Bundy's and Payne's prosecution was "direct[ed], guid[ed] and control[ed]" by AUSA's Ahmed, Myhre, and Bogden.  FAC 31-32.  (Page 10, Lines 19-21).  The FAC does "NOT" say *every* act by Bundy and Payne was controlled by an AUSA.  The FAC speaks for itself and Statement 32 clearly outline the actions of the law enforcement officers.

## B.   Favorable Termination.

Defendant claims that the Plaintiff's did not plead facts showing that the underlying action was terminated in the Plaintiff's favor.  Defendants cite to multiple cases to thereafter suggest that "Nevada state courts are silent regarding what constitutes a 'favorable termination'."

Plaintiff's FAC summarizes a January 8, 2018, hearing before United States District Court Chief Judge Navarro.   Section 109 of the FAC consisted of five (5) pages of the FAC wherein Chief Judge Navarro held among other findings that an outright "dismissal" of the indictment was necessary due to constitutional violations and that the "dismissal" was needed due to protect the judicial integrity by ensuring that a conviction rests only on appropriate

considerations validly before the jury; and to deter future illegal conduct.  Transcript at 21: 12-16, 21: 20-24.  (page 34 of FAC).

If the Court adopts the Defendant's viewpoint that Chief Judge Navarro dismissal is not a favorable termination, then it follows that a determination must be made as to what more is required for a "favorable termination?"  By the very nature of the criminal process, the standard at a jury trial is to "prove each and every element of a crime beyond a reasonable doubt."  Jurors don't vote to convict if they believe an indicted individual is innocent.  Nor is there any procedural mechanism that would apparently satisfy the Defendant in this matter.  A favorable termination does not get any better than the ruling of Judge Navarro.

Further, although the Defendant cites much caselaw to support his position,  the following case is directly "on point" and supports the Plaintiff in this matter.  "A malicious prosecution claim requires a plaintiff need only show that the criminal prosecution ended without a conviction." *Manansingh v. United States*, 2023 WL 2658753 (citing *Thompson v. Clark,* 142 S. Ct 1332, 1341).  Here, the indictment was dismissed in its entirety.  The FAC pleads the Plaintiffs as innocent victims of the law enforcement agencies, and no evidence has been disclosed that would suggest any alternative finding.

**C.**      **The FAC Pleads Facts That Show A Lack of Probable Cause.**

In Nevada, claims for malicious prosecution, false arrest, and false imprisonment require the plaintiff to show that the defendants lacked probable cause.  *See Jordan v. State ex rel. Dep't of Motor Vehicles and Pub. Safety,* 124 Nev. 227 (2008); *See also LaMantia v. Redisi,* 118 Nev. 27, 30 (2002).  While a grand jury indictment creates a rebuttable presumption of probable cause, that presumption can be overcome by an allegation of "false testimony or suppressed facts."  *See Jordan v. State,* 121 Nevada at 70 n. 65.  (Quoting *Ricord v. Cent. Pac. RR. Co.,* 15 Nevada 167,

180 (1880).  *Awabdy v. City of Adelanto,* 368 F.3d. 1062 (9th Cir. 2004), is dispositive on this issue.

In *Awabdy*, the Plaintiff alleged that he was wrongfully prosecuted due to his Arabic heritage and the fact that "as" a member of the Adelanto City Council, he was in conflict with many decisions of the other City Council members.  Eventually, Plaintiff was accused of public fund embezzlement.  That matter was investigated and Awabdy was charged criminally.  At the justice court level Awabdy was "held to answer" on criminal charges.  Later, prior to trial, the charges were dismissed.

Similar to this matter, Awabdy filed a federal civil action and as part of his claim, was required, as Plaintiffs are here, to prove that he was prosecuted without probable cause. Unfortunately, Awabdy was stuck in that in his criminal case "probable cause" had already been found.  Accordingly, the District Court, based upon the lower courts finding of "probable cause", determined that Awabdy "could prove no set of facts consistent with the allegations in his complaint that would establish that he was prosecuted without probable cause." *Id*.   Upon review, the Ninth Circuit reversed, holding that the finding of probably cause was a rebuttable presumption.  The Court held that "among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id*. In the instant case, Judge Navarro already made a finding of wrongdoing by the Defendants and dismissed the case based upon those wrongdoings. It follows that the dismissal, in and of itself, is enough to rebut the presumption of probable cause.

### 3.     PLAINTIFFS' IIED CLAIM DOES NOT FAIL AT ALL LEVELS.

#### A.     Plaintiffs' Intention Infliction of Emotional Distress Is Not an Excluded Tort Under the Intentional Tort Exception to the FTCA.

Defendant claims that Plaintiffs' IIED claim arises out of the alleged malicious prosecution of Bundy and Payne and therefore, it is a specifically excluded tort under the intentional tort exception to the FTCA.  It is true that the waiver of sovereign immunity contains an exception for intentional torts, including false arrest, **unless** the intentional tort be committed by an "investigative or law enforcement officer." 26 U.S.C. 2680(h).  In fact, 28 U.S.C. 2680(h) specifically excludes from immunity "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law" which is exactly what law enforcement officers are.  The fact that an AUSA oversees or directs their actions does not extend the sovereign immunity to the investigative or law enforcement officers.  Here, the intentional torts of malicious prosecution and IIED are based upon the actions of DOI/FBI agents, BLM agents, and officers of those agencies.  Those agents are not afforded sovereign immunity for intentional torts that they engage in.  Plaintiffs' complaint is rife with tortious conduct by BLM SAC Love, Officer Stover, Brunk, Willis and other agents and officers of the FBI and BLM.  The fact that some of those actions were overseen or directed by AUSA's does not relieve the investigative or law enforcement officers of their responsibility and liability in connection with their tortious conduct.  Thus, neither malicious prosecution nor IIED is an excluded tort under the intentional tort exception to the FTCA and this Court has jurisdiction over the same.

**B.** **Plaintiffs Concede That Their IIED Claims Are Not Sufficiently Pled**.

In *Sheehan v. U.S.*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of emotional distress claim in FTCA actions. To that end, Plaintiffs pled the elements of the cause of action of intentional infliction of emotional distress. However, Plaintiffs now realize that they must demonstrate that they have suffered physical manifestations of emotional distress to support a plausible claim for IIED and are willing to concede that they have failed to do that to date. That is not to say that Plaintiffs have not suffered emotional distress that has manifested itself in physical ways.

Notwithstanding the lack of sufficient allegations of physical manifestations, Defendants allegation that Plaintiffs fail to allege facts which show the extreme and outrageous conduct necessary to support an IIED claim is completely misplaced. Plaintiff specifically include a laundry list of actions taken by Government Employees that was outside all possible bounds of decency and regarded as utterly intolerable in a civilized community. It is clear from both the allegations in Plaintiffs' complaint and the findings of Judge Navarro that the Government Employees abused their position within the FBI and DOI by which they had the actual or apparent authority over Plaintiffs.

Further, any question as to whether the Government Employees conduct was extreme and outrageous is terminated upon reading Judge Navarro's findings that the "government's conduct in this case was indeed outrageous . . ." [January 8, 2018, Hearing Transcript ("Transcript"), 21:08-11] and that dismissal of a case is only appropriate in extreme cases in which the government's conduct violates fundamental fairness." [Transcript 9:17-21]. In reading Judge Navarro's decision, it is clear that she is incensed and completely, utterly shocked at the behavior

of the Governmental Employees (including not only the prosecution but also the investigative agencies and their employees).

It is well settled that if the court grants a motion to dismiss, the court should grant leave to amend, even if no request to amend is made, unless the court determines that the pleading could not possibly be cured by the allegation of other facts. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Here, Plaintiffs are able to provide, as part of an amended complaint, specific facts that support the physical manifestations that each of the Plaintiffs have suffered as a result of the emotional distress intentionally inflicted upon them by the Government Employees.   Plaintiffs believe that they have pled facts which establish the Government Employee's conduct was extreme and outrageous.  However, if the Court does not agree, Plaintiffs can include additional facts supporting such a finding.  Accordingly, Plaintiffs respectfully request leave of court to amend their Amended Complaint to do just that.

### 4.      LOSS OF CONSORTIUM IS DERIVATIVE OF THE PHYSICAL HARM.

An action for loss of consortium is derivative of the primary harm to the physically injured spouse or parent. *Fakoya v. County of Clark*, 2014 WL 5020592 at *9 (D.Nev. 2014) (citing *Gen. Motors Corp v. Eighth Judicial Dist. Court of State of Nev. Ex rel. Cnty. Of Clark*, 122 Nev 466, 134 P.3d 111 (Nev. 2006)).  It has been established that Ryan Bundy was physical injured in a number of ways, including physically, emotionally and mentally, as a result of the abhorrent actions and conduct of the Government Employees.  Likewise, knowledge of those injuries and the loss of their spouse and parent for an extended period of time as a direct consequence of the Government Employees' actions supports a loss of consortium claim.

Here, it is anticipated that Plaintiff Ryan Bundy will be successful in bringing a cause of action against the Government Employees for violations of the FTCA. As a result, his wife and children also have a cause of action for loss of consortium against the alleged tortfeasors.

### IV.

### CONCLUSION

Based on the foregoing facts and circumstances, Plaintiffs respectfully request that Defendant's Motion to Dismiss be denied in its' entirety. Further, if the Court deems the Defendant's argument(s) to dismiss any of the intentional torts persuasive, Plaintiffs respectfully request leave to amend their Amended Complaint.

DATED this 22nd day of July, 2024.

JUSTICE LAW CENTER

/s/ Bret O. Whipple
BRET WHIPPLE, ESQ.
Nevada Bar No. 6168
1100 S. 10th Street
Las Vegas, Nevada 89104
*Attorney for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, I submitted the foregoing to CM-ECF, the electronic filing service portal utilized by the U.S. District Court for the District of Nevada, which will give notice of said filing to the following at the email designated for service:

Jevechius D. Bernardoni
Assistant United States Attorney
Attorneys for the United States of America

/s/ Jeanne Metzger
An Employee of JUSTICE LAW CENTER

43