BRET O. WHIPPLE, ESQ.
Nevada Bar #6168
**JUSTICE LAW CENTER**
1100 S. Tenth Street
Las Vegas, NV  89104
(702) 731-0000
civil@justice-law-center.com
Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| RYAN BUNDY, individually; ANGELA BUNDY, individually; JAMIE BUNDY, individually; VEYO BUNDY, individually; JERUSHA BUNDY, individually; JASMINE BUNDY, individually; OAK BUNDY, individually; CHLOEE BUNDY, individually; M.B., a minor child, individually; S.B. a minor child, individually; and, RYAN PAYNE, Individually,<br><br>                    Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br><br>                    Defendant. | Case No.: 2:23-cv-01724-RFB-MDC<br><br><br><br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

Plaintiffs, through undersigned counsel, BRET O. WHIPPLE, ESQ., of the JUSTICE

LAW CENTER, for their claims against Defendant, and each of them, jointly and severally,

based upon knowledge, information, and belief, aver and allege as follows:

**JURISDICTION & VENUE**

1.      This Court possesses original subject matter jurisdiction over Plaintiffs' affirmative claims for relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), including, without limitation, exclusive jurisdiction of Plaintiffs' 28 U.S.C. § 1346 Federal Tort Claims Act ("FTCA") claims against the United States due to the negligent, wrongful acts and/or omissions of several federal employees who, while acting in the course and scope of their employment with their respective federal agencies, caused acts and events to occur within this forum under circumstances where the United States, if a private person, would be liable to Plaintiffs as detailed in 28 U.S.C. § 2674 and the laws of the State of Nevada where the Defendant's acts or omissions occurred.

2.      Venue of this matter is properly before this Court pursuant to 28 U.S.C. § 1391 as the underlying action and corresponding damages occurred within this District and the United States is a named Defendant.

**PARTIES**

3.      Plaintiff Ryan Bundy ("Ryan Bundy") is, and at all material times was, married to Plaintiff Angela Bundy, and the father of Plaintiffs Jamie Bundy, Veyo Bundy, Jerusha Bundy, Jasmine Bundy, Oak Bundy, Chloee Bundy, M.B, a minor child, and S.B., a minor child.

4.      Plaintiff Ryan Bundy was a "Tier 1 defendant," "Tier 1 Plaintiff" or collectively with Plaintiff Ryan Payne "Plaintiffs" herein.

5.      Plaintiff Ryan Payne was a "Tier 1 defendant," "Tier 1 Plaintiff" or collectively with Plaintiff Ryan Bundy "Plaintiffs" herein.

6.      Plaintiff Angela Bundy is, and at all material times was, a Nevada domiciliary and citizen of the United States, married to Plaintiff Ryan Bundy, and the mother of Plaintiffs Jamie

Bundy, Veyo Bundy, Jerusha Bundy, Jasmine Bundy, Oak Bundy, Chloee Bundy, M.B., a minor child, and S.B., a minor child.

7. Plaintiffs Angela Bundy, Jamie Bundy, Veyo Bundy, Jerusha Bundy, Jasmine Bundy, Oak Bundy, Chloee Bundy, M.B., a minor child, and S.B., a minor child shall hereinafter be referred to collectively as the "Bundy Family Plaintiffs."

8. Defendant UNITED STATES is the federal government and, through its various agencies (e.g., Federal Bureau of Investigation ("FBI"), Department of the Interior ("DOI") and Bureau of Land Management ("BLM"), described more specifically below), and their employees (i.e., Joel Willis, Daniel P. Love, Rand Stover and Mark Brunk) — each of whom, for purposes of Plaintiffs' Federal Tort Claims Act ("FTCA") claims, was acting within his/her official capacity and within the scope and course of her/his employment with the applicable federal agency — caused acts and events to occur within this forum from which Plaintiffs' claims arose.

A. The FBI is, and at all material times was, the investigative arm of Defendant UNITED STATES, doing business in this District, and the employer of Special Agent Joel Willis.

B. The DOI is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES, responsible for the management and conservation of federal lands and natural resources through the BLM (the employer of Special Agent in Charge of the BLM's Gold Butte Cattle Impoundment Operation ("SAC") Daniel P. Love, and Officers Rand Stover and Mark Brunk), with both agencies doing business in this District.

9. UNITED STATES' employees Willis, Love, Stover and Brunk (each of whom caused acts and events to occur within this forum while acting in the scope and course of his/her

employment with, and official capacities for, his/her respective federal agencies) shall hereinafter collectively be referred to as the GOVERNMENT EMPLOYEES.

10.    Plaintiffs were criminal defendants in a proceeding advanced by the UNITED STATES and its employees in the United States District Court for the District of Nevada in United States v. Bundy et al., Case No. 2:16-cr-00046-GMN-PAL ("Underlying Action").[1]

11.    Notably, in the Underlying Action, the GOVERNMENT EMPLOYEES, Willis, Love, Stover and Brunk, spent hundreds of millions of government dollars in a multi-state effort to falsely indict Plaintiffs of fabricated crimes purportedly dating back to 2014 and, to that end, forced Plaintiffs to wrongfully endure incarceration and monitoring, mostly at a punitive federal-contracted prison in Pahrump, Nevada.

12.    During that time, Plaintiffs suffered severe emotional, physical, mental, occupational and financial distress as described more fully herein.

### STATEMENT OF THE CASE

13.    Since January 7, 1877 (13 years after Nevada was admitted into the union on equal footing with the original thirteen states on October 31, 1864), ancestors of Plaintiffs Ryan Bundy and the Bundy Family (i.e., all members of the Church of Jesus Christ of Latter Day Saints, "LDS"), migrated to this State and the Gold Butte area in Clark County, Nevada, ultimately securing deeds from the State of Nevada to land and water along the Gold Butte region.[2]

---

[1] In the Underlying Action, nineteen (19) Bundy defendants were separated into three (3) distinct trial groups; namely, the "Tier 1" (the alleged "leadership" defendants); "Tier 2" (the claimed "mid-level leadership" defendants); and "Tier 3" (the alleged "gunmen") groups.

[2] Although the name "Mormon" has been used historically to refer to members of the LDS faith, the name is actually a derogatory term — one first coined by former Missouri Governor Boggs in the 1800s during the persecution of early LDS Church leaders and in furtherance of Governor Boggs' Extermination Order. That name, used repeatedly by the GOVERNMENT EMPLOYEES, is recognized as offensive by the LDS community and will be used

14. Upon that land, the Bundy family formed the Bundy Ranch as a living testimony of their family history, work ethic, pride, and patriotism — a legacy which serves as an integral part of our American history and the development of the Great Basin region throughout the Western United States.

15. That legacy has been handed down from generation to generation with Plaintiff Ryan Bundy learning the same from his father, Cliven Bundy, and his own hands-on experience working at the Bundy Ranch.

16. Plaintiff Ryan Bundy in turn, has honorably passed on that same history, work ethic, pride and patriotism to his wife and children.

17. Over these generations, the Bundy family has invested their blood, sweat, tears and considerable labor, material and expense to improve the Bundy Ranch, including, without limitation, developing numerous artesian springs and aquifers on the Gold Butte Mountain Range, and securing title from the State of Nevada to the accompanying water rights.

18. Those springs, in turn, have served as a life force for the Bundy family's cattle that were lawfully grazing on the Bundy Ranch and its surrounding lands.

19. Upon information and belief, as part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers, including, without limitation, the Bundy family, and to sell off or otherwise lease those rights for commercial development or other land-use purposes, the DOI/BLM sought to wage economic and financial warfare against the ranchers by imposing restrictive grazing restrictions and limiting the number of cattle that could graze upon those lands for the sole purpose of

throughout this pleading when attributable to the GOVERNMENT EMPLOYEES as evidence of their animus toward Plaintiffs and the LDS community.

burdening the ranchers' operations until they became not viable and the ranchers would thus be compelled to discontinue ranching.

20.    To that end, in 1998, the UNITED STATES initiated a civil suit against Cliven Bundy in the United States District Court for the District of Nevada, Case No. 2:98-cv-00531, seeking monetary damages for his refusal to obtain BLM grazing permits and pay the corresponding fees. That action, United States v. Cliven Bundy, resulted in a judgment in favor of the UNITED STATES — a majority of which constituted fines, penalties, and interest.

21.    Armed with that judgment, the GOVERNMENT EMPLOYEES, Willis, Love, Stover and Brunk, conspired together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters, including, without limitation, Plaintiffs, into an armed confrontation in April 2014 stemming from, among other things: the rounding-up and seizure of certain Bundy Ranch cattle and staging of same in Bunkerville, Nevada, the egregious execution of other cattle from helicopters circling the Bundy Ranch and surrounding Gold Butte area, and their unauthorized destruction of various Bundy family spring sites and water improvements.

22.    The round-up operation was intentionally and deliberately carried out, upon information and belief, at the specific direction of GOVERNMENT EMPLOYEES, Willis, Love, Stover and Brunk, in a brutal, violent, and aggressive manner. Under the guise of executing a court order to collect grazing fees, an alleged and unverified debt, the federal government — BLM and FBI — invaded the Bundy Ranch in April of 2014 and violently assaulted and extorted Plaintiff Ryan Bundy and his family members and killed his family's cattle. Federal agents threatened the lives of Plaintiff Ryan Payne and Plaintiff Ryan Bundy and his family by training sniper rifles directly at him and his wife and children, assaulted Plaintiff Ryan Bundy's elderly aunt by throwing her to the ground, tased one of his brothers multiple

6

times, violently threw another of his brothers to the ground and vehemently crushed his face into the coarse gravel causing lacerations to his face, killed his bulls and some other cattle, and concealed them in a mass, secret grave.

23.     Notably, upon information and belief, BLM SAC Love and Officers Stover and Brunk determined that violent, aggressive, excessive, and authoritarian tactics would compel Cliven Bundy and his supporters to defend themselves and their property or otherwise respond physically and thereby justify the GOVERNMENT EMPLOYEES' planned use of force in the Cattle Impoundment Operation. As stated by BLM special agent Michael Johnson to Ryan Bundy several days prior to the Cattle Impoundment Operation: "This will be the next Waco or Ruby Ridge. We will kill you." During the Standoff, Plaintiff Ryan Bundy kept and bore a side-arm pursuant to his Second Amendment rights. Neither Plaintiff Ryan Bundy nor his supporters harmed or threatened any federal agents, while at the same time the protestors had heavily equipped federal agents armed with sniper rifles and other firearms pointed directly at them. BLM special agent Dan Love told his fellow agents to go out there and kick Cliven, Ryan and others in the Bundy family in the mouth or teeth and take their cattle and stated that he needed his agents to get the troops fired up to go get those cows and not take anything from anyone. Love had a Kill Book as a trophy where he bragged about getting three individuals in Utah to commit suicide as a result of his heavy-handed actions in another case, as well as having a kill list for the Bundys. The FBI maintained an Arrest Tracking Wall where photos of Plaintiff Ryan Bundy and his family members and co-defendant Eric Parker were marked with an "X" over them, as if to indicate that they had already been killed or would be killed soon.

24.     To that end, a whistleblower memorandum authored by BLM Special Agent Larry Wooten in November 2017 (the "Wooten Memo") expressly documented and memorialized

7

BLM SAC Love's stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him and took him to the ground.

25.   The GOVERNMENT EMPLOYEES' Cattle Impoundment Operation and resulting standoff proved to be an absolute disaster for the GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk; notably, hundreds, perhaps thousands, of protestors came out to support the Bundy family, express their anger for the federal government's abuse of power, its usurpation of State's rights and the unconstitutional taking and destruction of private property in violation of the law.

26.   Although Plaintiffs did not engage in any wrongful conduct, they, nevertheless, were: wrongfully arrested, detained, wrongfully separated from their families, friends and loved ones and imprisoned for nearly two years, before being summarily released from custody based on the judicially-determined wrongdoings of GOVERNMENT EMPLOYEES, Willis, Love, Stover and Brunk, including, without limitation, the GOVERNMENT EMPLOYEES' knowing and intentional use of fabricated evidence to wrongfully arrest, detain, and imprison Plaintiffs, and their knowing and intentional failure to disclose extensive exculpatory evidence memorializing same. In dismissing the charges against Plaintiffs, Federal Judge Gloria Navarro lambasted the GOVERNMENT EMPLOYEES' conduct and the agency witnesses who had lied under oath or in argument to the Court, saying that they were guilty of flagrant misconduct and characterizing their conduct as outrageous. Judge Navarro held that dismissal with prejudice was the only sufficient remedy given the extreme scope of the misconduct and bad faith committed.

27.   Notably, Plaintiffs were falsely indicted in the Underlying Action on sixteen (16) criminal counts, including, without limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting, and obstructing federal officers, and four (4) counts of using

firearms in crimes of violence resulting from a standoff with agents of the BLM and other federal agencies near Bunkerville, Nevada in connection with the GOVERNMENT EMPLOYEES' Cattle Impoundment Operation.

28.    During that same period of time, Plaintiff Angela Bundy was harassed, targeted, repeatedly stalked, and instigated by the GOVERNMENT EMPLOYEES and other agents and officers of the aforementioned federal agencies; and she, along with her children, were forced to endure, among other things: stress, mental, physical, emotional, and financial anguish, and loss of consortium resulting from the GOVERNMENT EMPLOYEES', Willis, Love, Stover and Brunk's, egregious imprisonment of Plaintiffs; the inability for their family to freely practice their faith and attend weekly family worship services and other church events; and financial, occupational, and reputational harm as a result of the GOVERNMENT EMPLOYEES' egregious defamation. Top agents, without the approval or consent of any authority, instigated the unlawful monitoring of post-arrest jail phone calls between Plaintiff Ryan Payne and Plaintiff Ryan Bundy and his wife for the apparent purpose of making fun of them whenever they expressed their anguish to one another during their phone conversations.

a.  **GOVERNMENT EMPLOYEES' Official Capacity Conduct Performed While Acting in the Scope and Course of Their Employment**

29.    In the Wooten Memo, BLM Special Agent Larry Wooten, who was the Case Agent/Lead Investigator for the Cliven Bundy/2014 Gold Butte Trespass Cattle Impound, indicated that he routinely observed, and the investigation revealed, a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security. The investigation indicated that these issues amongst law

enforcement supervisors in that agency made a mockery of the position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected the agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators, and ignored the letter and intent of the law.

30.    Wooten further indicated that the misconduct was discriminatory, harassing and showed clear prejudice against the defendants and often times centered on being sexually inappropriate, involved profanity, appearance and body shaming, and likely violated privacy and civil rights, and opined that the issues he uncovered likely put the BLM and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy.

31.    As a result of the information disclosed by Agent Wooten, upon information and belief, he was removed from his position as the Case Agent/Lead Investigator for the Cliven Bundy/Gold Butte Nevada case, despite his hard work, to prevent the ethical and proper further disclosure of the severe misconduct, failure to correct and report, and cover-ups by BLM supervision, and items were seized from his office that contained significant evidence of misconduct and items that would potentially embarrass BLM Law Enforcement Supervision.

32.    GOVERNMENT EMPLOYEES Willis, Love, Stover, and Brunk knew or reasonably should have known that the actions they took within their sphere of official responsibility would violate the constitutional rights of the Plaintiffs, or alternatively they took those actions with malicious intent to cause a deprivation of constitutional rights or other injury.

33.    BLM Officers SAC Love, Officers Stover and Brunk, and others, all of whom were employed by the UNITED STATES, carefully prepared and fabricated evidence throughout the investigative stage of the Underlying Action, and knowingly, intentionally, and willfully concealed exculpatory evidence regarding the Plaintiffs' innocence and concealed the

outrageous, unlawful, and unconstitutional aspects of the GOVERNMENT EMPLOYEES' conduct related thereto.

34.     For example, GOVERNMENT EMPLOYEES Willis, Love, Brunk and Stover, along with other agents and officers of the FBI and BLM, intentionally and systematically fabricated, shaped, and clarified evidence and testimony, altered records, withheld evidence, and gave false testimony in order to obtain grand jury indictments against, detain, prosecute and convict Plaintiffs of crimes they did not commit. In August 2017, the defense had requested information related to a camera placed near the Bundy Ranch. The request was supported by an affidavit from Plaintiff Ryan Bundy, who averred that he had seen a camera device on a tripod with a telephoto lens and a visible laser. He said the tripod was on a hill northeast of and overlooking the Bundy house. GOVERNMENT EMPLOYEES indicated that it was only placed to cover the roads near the Bundy Ranch. However, during the Tier 1 trial, attorneys for Plaintiffs learned that the FBI had in fact set up a camera on a hill northeast of the Bundy home that had a live feed to BLM's command center. The district court agreed with the defendants that the requested surveillance-camera evidence was material. It was not until the documents were released that it became evident that the camera was deliberately placed so it would have a view of the Bundy home. Over the course of the hearings, the district court found the information favorable to the accused and potentially exculpatory and criticized the government for withholding it on the implausible claim that no one viewed anything reported from the camera.

35.     In the days following the April 12, 2014, standoff and cattle release, many GOVERNMENT EMPLOYEE witnesses authored reports and gave interviews. Notably, Officer Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a hilltop where Brunk was acting as a spotter and observer for a BLM sniper. Nearly a year later, on

February 24, 2015, Agent Willis attempted to correct Brunk's prior statement by having Officer Brunk clarify that he never acted as a spotter or observer for a BLM sniper, nor did he ever tell the FBI that he acted as a spotter or observer for a BLM sniper during his original interview.

36.     Upon information and belief, Agent Willis attempted to correct the record and his subsequent testimony to protect himself from prosecution for providing or otherwise suborning perjured testimony before the Grand Jury, and to assist the GOVERNMENT EMPLOYEES in furtherance of their unlawful conspiracy. Upon information and belief, Agent Willis' clandestine attempt to clarify the statement of an employee of another federal agency — the BLM — was to make sure that the GOVERNMENT EMPLOYEES' version of events matched the fabricated record that was presented to the Grand Jury to secure rogue indictments against Plaintiffs. Not only did Agent Willis falsely inform the Grand Jury that the UNITED STATES did not deploy snipers in 2014, he wrongfully accused the Bundy defendants of being snipers.

37.     In furtherance of the GOVERNMENT EMPLOYEES' fabricated scheme, BLM SAC Love cloaked the BLM Cattle Impoundment Operation as merely an effort to enforce a 2013 civil court order. In reality, the primary purpose behind the 2014 Cattle Impoundment Operation was to frame and entrap Cliven Bundy, the Plaintiffs, and other supporters to react or otherwise physically respond to the GOVERNMENT EMPLOYEES' violent, aggressive, excessive, and authoritarian tactics, and thereby justify the GOVERNMENT EMPLOYEES' planned use of force and their fabrication of criminal charges against them.

38.     To that end, the GOVERNMENT EMPLOYEES staged a confrontation between the Bundys and BLM contract cowboys during a local television news interview on March 28, 2014. Notably, BLM SAC Love and Officer Stover coordinated, timed, and orchestrated the arrival of the BLM-hired contract cowboys and their corresponding equipment to coincide with a

pre-arranged television interview between Cliven Bundy and his sons with KLAS Channel 8 News at that same location — an interview, upon information and belief, that was surreptitiously arranged by BLM SAC Love and Officer Stover.

39.     BLM SAC Love and Officer Stover secretly filmed the encounter between the Bundys and the BLM's contract cowboys with the intent of provoking violence and/or hostilities between them — conduct which, in turn, would prompt law enforcement intervention and the planned arrests of Cliven Bundy and his supporters, including, without limitation, the Plaintiffs. The Bundys and their supporters, however, did not respond to the BLM's contract cowboy provocation and, instead, peacefully photographed the contract cowboys to memorialize the incident and the egregious attempt by the GOVERNMENT EMPLOYEES to entrap or otherwise provoke the Bundys into a violent response.

40.     Notwithstanding the foregoing, the UNITED STATES would later use video from this March 28, 2014, BLM contract cowboy incident to intentionally mislead a federal grand jury into indicting Plaintiffs, essentially spinning the incident as an example of the Bundys' provocation of the BLM, including their alleged violent response to the BLM's Cattle Impoundment Operation and its standoff area near the Toquop Wash and Interstate-15 in Clark County, Nevada.

41.     Moreover, during their investigative efforts in 2013 and leading up to the March and April 2014 incidents, BLM SAC Love and Officer Stover proposed and conducted the operational plan to ensure that the final Cattle Impoundment Operation would, among other things: outrage the ranching community, especially the Bundy family and their supporters; provoke a confrontation between them; and entrap the Bundy family, including, without limitation, the Plaintiffs, into responding with physical acts of violence that would justify the

GOVERNMENT EMPLOYEES to arrest, detain, and incarcerate Cliven Bundy, the Plaintiffs, and other Bundy family supporters.

42.    Pursuant to that scheme, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas and purposefully forced all those who wanted to challenge the GOVERNMENT EMPLOYEES' actions to do so at one of two small dirt parcels adjacent to highways in the Bunkerville area known as First Amendment Zones. Notably, these two areas, located a considerable distance away from the BLM's Cattle Impoundment Operation and orchestrated staging area, were, upon information and belief, purposefully selected by BLM SAC Love, Officers Stover and Brunk, among others, to maximize the impairment of any protestors' First Amendment rights, including, without limitation, the Plaintiffs and Bundy Family members, and to incite those who would protest against the GOVERNMENT EMPLOYEES' rogue operation and unconstitutional conduct — including the purposeful destruction of the Bundy family's spring sites and artesian wells and accompanying water rights — into a physical altercation.

43.    In particular, the GOVERNMENT EMPLOYEES' egregious plan, orchestrated by Agent Willis, and BLM SAC Love, Stover and Brunk, among others: seized cattle belonging to Cliven Bundy and the Bundy Ranch; visibly transported same to the BLM's staging area; demonstrably shot several other cattle from helicopters that circled the Bundy Ranch and surrounding areas; and, after having destroyed several thousands of dollars of the Bundy family's water right improvements and artesian springs and aquifers, purposefully paraded a convoy of DOI/BLM vehicles and other construction demolition equipment before the Bundys, the Plaintiffs, and their supporters in order to provoke them into resisting or otherwise defying the GOVERNMENT EMPLOYEES' efforts.

44. In furtherance of that same scheme, the GOVERNMENT EMPLOYEES, and others at their direction and control, later brutally arrested, assaulted, beat, and kicked Dave Bundy, as the GOVERNMENT EMPLOYEES had planned.

45. Throughout that entire investigative and pre-judicial process, GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk, among others, purposefully, intentionally, and knowingly sought to infringe upon various well-known and clearly understood federal and state constitutional rights for the calculated and orchestrated purpose of entrapping the Bundys, the Plaintiffs, and their supporters, and enticing them into physically or violently responding to the GOVERNMENT EMPLOYEES' egregious actions and interference with those rights.

46. Although the GOVERNMENT EMPLOYEES collectively knew that their concocted charges were false, they, nevertheless, deceptively attempted to strong-arm the indicted Bundy supporters into accepting plea agreements, knowing that any such agreements could be used against all of the other named Bundy defendants in the Underlying Action. In this regard, the GOVERNMENT EMPLOYEES advised the Plaintiffs, among other things, that: a conviction against them on all counts would impose mandatory minimum life sentences which would separate them from their friends, family and loved ones for the rest of their lives or for many years — an outcome that could be avoided if they simply pled guilty to one or more of the bogus conspiracy charges; and, if they did so, the GOVERNMENT EMPLOYEES would release them from custody.

47. The GOVERNMENT EMPLOYEES, Willis, Love, Stover and Brunk, directed that informants be planted among the Plaintiffs during their incarceration and that other inmates housed with Plaintiffs surreptitiously be offered an immediate release from custody if those

inmates would testify falsely against the Plaintiffs regarding the GOVERNMENT EMPLOYEES' concocted criminal charges.

48.    The GOVERNMENT EMPLOYEES also prepared, instructed, and directed others to prepare fabricated investigative documents for those inmates to sign, thus manufacturing false evidence that would be used in their rogue prosecution against the Plaintiffs in violation of the law and said Plaintiffs' constitutional and due process rights.

**b. The State of Nevada's Intervention & De-Escalation Efforts**

49.    Recognizing that the unlawful and unconstitutional powder-keg lit by the GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk was rapidly escalating out of control, Nevada's former Governor Brian Sandoval, former Clark County Sheriff Doug Gillespie, and Assistant Clark County Sheriff Joe Lombardo intervened to de-escalate the matter.

50.    Notably, in the midst of increasing political pressure and public outrage over the GOVERNMENT EMPLOYEES' egregious conduct, the former Nevada Governor, Clark County Sheriff, and Assistant Sheriff took control of the scene and, through Assistant Clark County Sheriff Joe Lombardo, issued orders directing the BLM and GOVERNMENT EMPLOYEES to wind down their operation and to release the Bundy family's cows from the cattle pen.

51.    Recognizing that the GOVERNMENT EMPLOYEES' unlawful and unconstitutional conduct had failed to produce the planned results, those orders were implemented and federal and state officers were directed to ensure that a Bundy, if not Cliven Bundy himself, would pull the pins from the cattle pens to affirmatively establish the GOVERNMENT EMPLOYEES' fabricated theories of criminal conspiracy, extortion, and armed robbery, among other false claims, against the Plaintiffs.

52.     In accordance with the State orders and at the direction of the GOVERNMENT EMPLOYEES, Margaret Houston, a sister of Cliven Bundy, ultimately pulled the pin on the cattle pen and released the cattle, which was utilized to support the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's rogue prosecution of the Plaintiffs.

**c. Defendants' Longbow Productions Scam**

53.     In furtherance of the GOVERNMENT EMPLOYEES' scheme to wrongfully incarcerate the Plaintiffs, and to manufacture evidence in support of the fabricated claims against them, Agent Willis concocted a scheme to deceive the Plaintiffs, and their supporters, into making incriminating statements or confessions through the UNITED STATES' unprecedented undercover FBI operation named Longbow Productions.

54.     Notably, Agent Willis, among others, directed hundreds of thousands of taxpayer dollars into an operation in which masquerading FBI undercover agents falsely posed as a film crew making a documentary of the 2014 standoff.

55.     Upon information and belief, Agent Willis directed the FBI undercover agents to entice the Plaintiffs, along with other to-be-named defendants, with alcohol, money and other goods and favors to exaggerate their respective involvement in the GOVERNMENT EMPLOYEES' orchestrated standoff or to otherwise misstate, exaggerate or falsely hype the event itself, so that the GOVERNMENT EMPLOYEES could increase the likelihood of securing convictions in rogue criminal proceedings that would ultimately be initiated.

56.     To that end, Agent Willis, among others, successfully deceived various Bundy family members and supporters into participating in the staged interviews — interviews in which the undercover FBI agents, at said GOVERNMENT EMPLOYEES' prodding, asked leading questions, with the answers later being selectively edited and used in the Underlying Action.

### d. Subornation of Perjury & Falsehoods to the Grand Jury

57.     The fact that the GOVERNMENT EMPLOYEES had scripted and directed the filming of a video depicting a Bundy removing a pin from the cattle pen at the GOVERNMENT EMPLOYEES' Cattle Impoundment Operation became problematic when a grand jury indictment against the Plaintiffs was sought the following year.

58.     Photographic and testimonial evidence place law enforcement and prosecutors together at the ranch before any of the events for which the Plaintiffs Bundy and Payne arose. Under the bright light of the overwhelming evidence of the animosity law enforcement held for the Plaintiffs, and their plans to "kick the Bundys in the teeth" and/or arrest and charge the Plaintiffs, it is clear that law enforcement directed or, in the very least, put overwhelming pressure on prosecutors to file charges.  Charges for which there existed no probable cause.  Law enforcement continued to put pressure on the prosecution of the case by withholding exculpatory evidence and lying about the snipers and the surveillance.  All the while, law enforcement maintained an environment of clear and intense collusion to eliminate the Bundys.  The misconduct of law enforcement resulted in a true bill from the grand jury and the subsequent farce of a trial.  The FBI and the BLM were driving the bus which led to Plaintiff's charges and incarceration.

59.     Both the trial judge and the 9th circuit recognized that the key element to the charges against the Plaintiffs were allegations that Plaintiff Bundy fabricated and lied about the presence of government snipers and the inherent danger of life.  Plaintiff Payne and others responded to the call, under the assumption that the snipers existed and there was clear and present danger of substantial bloodshed.  They came to protest and protect.  Law enforcement repeatedly and emphatically denied the presence of snipers from the beginning, which gave

prosecutors the probable cause to file the ensuing charges and take the case to the grand jury. Law enforcement continued to maintain the lie that there were no government snipers and withheld evidence of surveillance throughout the grand jury proceeding. Without the inclusion of the exculpatory truth, that the Plaintiffs were in danger from armed snipers and were justified in making preparation for self-defense, the grand jury found probable cause. Without the lie, there would have been no probable cause to charge plaintiffs.

60. The indictment against the defendants was dismissed with prejudice and that order was upheld upon appeal to the 9th Circuit, United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020). While the dismissal was technically based substantially on constitutional Brady v. Maryland, 373 U.S. 83 (1963), violations, the court recognized that the evidence withheld by law enforcement, specifically the presence of snipers surrounding the ranch, supported a self-defense argument on the part of the plaintiffs. If Plaintiffs had been lying about the presence of government snipers, they were not justified in putting out a call for self-defense. However, Plaintiff Bundy was telling the truth and was legally justified when he put out the call that he and his family were surrounded by government snipers and in imminent danger. That fact was hidden by the FBI and BLM. Plaintiff Payne was justified for responding to that call. Plaintiffs Bundy and Payne were and remain justified by self-defense and their constitutionally protected rights to assemble and to bear arms for all of the actions for which they were wrongfully accused. They are "actually innocent." But for the outrageous conduct of Defendants, there could not have been any charges or incarceration.

61. Throughout 2015 and 2016, Agent Willis and BLM SAC Love, and Officers Stover and Brunk deliberately, maliciously, and intentionally misled the Grand Jury so that they could falsely obtain indictments against the Plaintiffs.

62.     For example, on June 29, 2015, Agent Willis knowingly, intentionally and willfully misled the Grand Jury regarding the circumstances surrounding Dave Bundy's April 6, 2014, false arrest.

63.     Specifically, Agent Willis testified that Dave Bundy was in a closed area and that the agents encountered them in a closed area and asked them to leave.

64.     Agent Willis, however, knew that he was intentionally deceiving and misleading the Grand Jury when he provided that false information and testimony. In particular, he knew that, on that day, Plaintiff Ryan Bundy's brother Dave Bundy, and other Bundy family members, traveled from Utah to the Bundy Ranch in Clark County, Nevada to give flowers to their mother for her birthday via Nevada State Route 170 (S.R. 170), which was not a closed area when Dave Bundy observed what appeared to be snipers in sand bag embankments on the hill above the junction of Gold Butte Road and S.R. 170.

65.     Dave Bundy lawfully parked his car on the side of S.R. 170 and began photographing and filming the hilltop snipers with his Apple iPad. BLM agents, in response, falsely arrested him — and did so without any arrest authority or probable cause — illegally towed and searched his vehicle, and unlawfully removed and confiscated his iPad without a warrant. That electronic device contained photographs and video of the hilltop snipers, along with a recording of his telephone conversation to a 9-1-1 operator as the BLM agents were unlawfully arresting him. Pursuant to a District Court Order, Dave Bundy's Apple iPad was eventually returned to him in 2017 in an erased, altered, and damaged state.

66.     On March 2, 2016, Agent Willis knowingly and intentionally provided perjurious testimony to the Grand Jury to secure an indictment against Dave Bundy, falsely claiming that

Plaintiff Dave Bundy's vehicle was intended to impede the GOVERNMENT EMPLOYEES' convoy as it emerged onto S.R. 170.

67.     Notably, Agent Willis knew that Dave Bundy's vehicle was lawfully parked more than one hundred fifty (150) feet away from the S.R. 170 intersection and, as such, could not conceivably have been perceived as an attempt to impede the GOVERNMENT EMPLOYEES' convoy. Further, Agent Willis also unequivocally knew, but intentionally and willfully withheld from the Grand Jury, that there never was any probable cause or justification to arrest Dave Bundy.

68.     At that same time, Agent Willis testified that Mel Bundy threatened a federal officer when, in fact, there was absolutely no evidence of any such threats, nor probable cause to substantiate Mel Bundy's arrest.

69.     On September 16, 2015, Officer Stover knowingly, intentionally, and willfully testified before the Grand Jury regarding the BLM's threat assessments of the Plaintiffs and their propensity for engaging in potential acts of violence, despite knowing that the BLM assessments actually established that the Bundys would not engage in potential acts of violence.

70.     At that same time, Officer Stover also knowingly, intentionally, and willfully elicited and provided false and misleading testimony regarding the GOVERNMENT EMPLOYEES' use of snipers. Despite the fact that numerous federal agents and snipers were located on hillsides around the Bundy Ranch and the Cattle Impoundment Operation's staging area in April 2014, pursuant to the GOVERNMENT EMPLOYEES' scheme, Officer Stover egregiously claimed before the Grand Jury that the operational plan did not include the use of snipers, and that the purported use of snipers was merely a story concocted by the Bundys and their supporters.

71.     Officer Stover also materially misled the Grand Jury regarding the GOVERNMENT EMPLOYEES' First Amendment Zones imposed on the Bundy family, the Plaintiffs, and their supporters in March and April 2014.

72.     As noted above, the GOVERNMENT EMPLOYEES closed to the public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas and, in so doing, imposed the single largest infringement on free speech in American history, measured geographically.

73.     Hundreds of Americans traveled to the Bunkerville, Nevada area to protest the GOVERNMENT EMPLOYEES' impairment of the Bundy family's First Amendment right to free speech and the expression of their religious freedoms — restrictions which were also denounced by numerous public officials who readily acknowledged the unconstitutionality of same.

74.     Consequently, Officer Stover knew that in order for the Grand Jury to indict the demonstrators — persons who merely came to protest the GOVERNMENT EMPLOYEES' egregious conduct, support the Bundy family, and exercise their own constitutionally protected free speech rights — he had to knowingly, intentionally and willfully mislead the Grand Jury regarding same.

75.     Despite knowing that the First Amendment Zones: (1) were mandatory, in that federal officers told protesters that they must go to the designated First Amendment Zones; (2) offered no view whatsoever of any Cattle Impoundment Operations; (3) were located miles away from those operations; and (4) were actually patrolled, monitored, and watched over by armed government agents — Officer Stover testified at the Grand Jury that the operation plan included

setting up First Amendment Zones where the public could safely view some of the gather operations in a safe place, in close proximity as possible to the closed operational area.

### e. Defendants' Rogue Indictment

76.     On March 2, 2016, due to fabricated, misleading and perjured evidence and testimony, an indictment was obtained against the Plaintiffs.

77.     That same day, arrest warrants were sought for Plaintiffs Ryan Bundy and Ryan Payne, despite the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's knowledge that there was absolutely no probable cause whatsoever to support any of their arrests.

78.     To that end, Agent Willis knowingly used false, fabricated, and manufactured evidence, and withheld exculpatory evidence, to secure the arrest warrants.

79.     On or around February 2016, the Plaintiffs were unlawfully arrested and taken into custody.

80.     Shortly thereafter, indictments were filed against Plaintiffs which were silent as to any basis or probable cause to detain, arrest, or otherwise prosecute the Plaintiffs for any of the alleged crimes.

81.     Notably, the Plaintiffs' actual conduct — lawfully protesting the Government's egregious actions, standing, walking, riding horses and taking pictures of the GOVERNMENT EMPLOYEES' unlawful conduct — was deceptively described in the indictment as threatening, assaulting, and extorting federal officers, obstructing justice, and conspiring to violate federal laws or impede federal officers.

82.     Further, after the indictment was filed in the Underlying Action, Agent Willis, BLM SAC Love, and Officers Stover and Brunk conspired with one another to conceal, among other evidence, Dave Bundy's iPad, the BLM threat assessments, the GOVERNMENT

EMPLOYEES' use of snipers, and other exculpatory evidence from the Plaintiffs, their counsel, and all of the Bundy defendants in the Underlying Action.

83. The indictment also falsely claimed that the Bundy defendants in the Tier 1 proceeding caused images of Dave Bundy's arrest to be broadcast, combining them with false, intentionally misleading and deceptive statements to the effect that the BLM supposedly employed snipers, used excessive force, and arrested Dave Bundy for exercising his First Amendment rights.

84. During an evidentiary hearing at the Tier 1 trial, it was irrefutably established that the BLM did, in fact, employ snipers and use excessive force.

85. Those same facts prompted Chief Judge Navarro to dismiss the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's case against the Tier 1 defendants.

86. The indictment also baldly asserted that the Plaintiffs had used firearms in several serious crimes of violence. At no time, however, did Plaintiffs Ryan Bundy or Ryan Payne ever display, use, or threaten to use firearms in commission of any crime, nor did they commit any crimes, let alone a crime of violence.

**f. False Allegations Against the Bundys and Payne**

87. The rogue indictment against the Plaintiffs, based solely upon being a supporter of Cliven Bundy, baldly accused them of being leaders and organizers of the conspiracy who, among other things: recruited gunmen and other followers; interfered with impoundment operations through threats and use of force and violence; interfered with impoundment operations by attempting to extort BLM contractors; led the armed assault against federal law enforcement officers at the Impoundment Site; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers.

88.     The indictment also materially misrepresented Dave Bundy's actions that ultimately led to his false arrest on April 6, 2014, egregiously claiming that he interfered with impoundment operations by positioning himself to block a BLM convoy and refusing to leave the area when asked to do so, and that after failing to leave after repeated requests, he was arrested by law enforcement officers.

89.     Notably, as images from the April 6, 2014 incident confirmed — images of which Agent Willis was well-aware at that time — Dave Bundy's vehicle was parked at least one hundred fifty (150) feet away from the claimed S.R. 170 intersection where the BLM convoy would ultimately travel and, at that location, it was impossible for Dave Bundy's vehicle to have blocked the BLM convoy.

90.     Further, Agent Willis was also well aware that Dave Bundy was lawfully exercising his First Amendment rights when he photographed and filmed on his iPad the BLM officers, spotters, and snipers in plain view from the public highway, and that he was under no legal obligation to leave the area when asked to do so.

91.     The GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk also knew that Dave Bundy's iPad captured photographs and video of those entire events — evidence which completely exonerated Dave Bundy, established the egregiousness of the GOVERNMENT EMPLOYEES' actions that day, undermined the fabricated testimony of Agent Willis to the Grand Jury, and exposed other multiple false and misleading statements contained in the indictment — including, without limitation, Dave Bundy's telephone call with a 9-1-1 operator while he was being falsely arrested and assaulted by the BLM officers.

92.     Upon information and belief, BLM SAC Love, Officers Stover and Brunk, and Agent Willis, among others, hid, concealed, converted, altered, damaged and/or erased this

exculpatory evidence from Dave Bundy's iPad and concealed same from the Plaintiffs as part of the GOVERNMENT EMPLOYEES' egregious scheme to wrongfully convict Plaintiffs and imprison them for life for crimes they did not commit.

93.     As for Plaintiff Ryan Payne, the indictment alleged that on April 7, 2014, he posted false messages to followers stating, among other things, that the Bundy Ranch was surrounded by BLM snipers, that the Bundy family was isolated, and that the BLM wanted Cliven Bundy dead. Each and every one of those facts were later proven to be substantiated and true.

94.     After conferring with a DOI/BLM Ethics Official, the U.S. Office of Special Counsel ("OSC"), the BLM Office of Law Enforcement & Security Director Salvatore Lauro, and the Office of Professional Responsibility ("OPR") — each of whom ignored Mr. Wooten's concerns and sought to distance themselves from same — Mr. Wooten submitted a whistleblower complaint to expose the GOVERNMENT EMPLOYEES Love, Willis, Stover and Brunk's egregious conduct, including, without limitation, the untruthful testimony and non-disclosure of exculpatory evidence.

95.     Specifically, in the Whistleblower Complaint, Mr. Wooten exposed the GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk's conspiracy and their unlawful, unconstitutional conduct.

96.     Notably, Mr. Wooten revealed, among other things, that:

A. There was a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal violations among senior and supervisory staff at the BLM's Office of Law Enforcement and Security.

B. The issues amongst law enforcement supervisors in the agency made a mockery of the position of special trust and confidence, portrayed extreme unprofessional bias, adversely affected the agency's mission and likely the trial regarding Cliven Bundy and his alleged co-conspirators, and ignored the letter and intent of the law.

C. The issues he uncovered also likely put the DOI/BLM and specific law enforcement supervisors in potential legal, civil, and administrative jeopardy.

D. This was the largest and most expansive and important investigation ever within the Department of Interior.

E. BLM SAC Love specifically took on assignments that were potentially questionable and damaging — such as document shredding, research, discovery email search documentation, and as the affiant for the Dave Bundy iPad Search Warrant — and Mr. Wooten felt that BLM SAC Love wanted to steer the investigation away from misconduct discovery.

F. The misconduct caused considerable disruption in the workplace, was discriminatory, harassing and showed clear prejudice against the defendants, their supporters, and Mormons.

G. Oftentimes this misconduct centered on being sexually inappropriate, involved profanity, appearance and body shaming, and likely violated privacy and civil rights.

H. There were potentially captured comments in which DOI/BLM law enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into the ground, and Dave Bundy having little bits of gravel stuck to his face as a result of his unlawful arrest.

I. On two occasions, Mr. Wooten overheard BLM SAC Love tell another DOI/BLM assistant special agent in charge that other BLM employees and potential trial witnesses did not properly turn in the required discovery material, likely exculpatory evidence.

J. BLM SAC Love even instigated the unprofessional monitoring of jail calls between defendants and their wives, without consent, for the apparent purpose of making fun of post-arrest telephone calls.

K. BLM SAC Love sought to command the most intrusive, oppressive, large scale, and militaristic trespass cattle impound possible. Additionally, this investigation also indicated excessive use of force, civil rights and policy violations.

L. On February 18, 2017, when Mr. Wooten was removed from his position, BLM SAC Love conducted a search of Mr. Wooten's individually occupied secured office and secured safe within that office. During that search, BLM SAC Love, without notification or permission, seized the Cliven Bundy/Gold Butte Nevada Investigative hard copy Case File, notes — including specific notes on issues Mr. Wooten uncovered during the 2014 Gold Butte Nevada Trespass Cattle Impound and lessons learned — and several computer hard drives that contained case material, collected emails, text messages, instant messages, and other information.

M. Following this seizure, outside of Mr. Wooten's presence and without his permission, BLM SAC Love did not provide any property receipt documentation or other chain of custody documentation, reasonably needed for trial, on what was seized.

N. Mr. Wooten was also aggressively questioned by BLM SAC Love about who Mr. Wooten had told about the case-related issues and other severe issues uncovered in reference to the case and BLM SAC Love.

O. Mr. Wooten was convinced that he was removed to prevent the ethical and proper further disclosure of severe misconduct, failure to correct and report, and cover-ups, including, without limitation, civil rights violations and excessive use of force.

P. Mr. Wooten identified the loss and destruction of, or purposeful non-recording of, key evidentiary material. Mr. Wooten concluded that he believed these issues would shock the conscience of the public and greatly embarrass the BLM if they were disclosed.

97.    In response, Chief District Court Judge Navarro held an evidentiary hearing and, at that hearing, discovered, including, without limitation, extensive exculpatory evidence regarding the Tier 1 and Tier 2 defendants that had been knowingly, intentionally and willfully withheld by GOVERNMENT EMPLOYEES Willis, Love, Stover and Brunk.

98.    In this regard, as the January 2018 hearing from the Tier 1 Motion to Dismiss Hearing reveals, Chief Judge Navarro expressly held, among other things, that: in this case, the GOVERNMENT EMPLOYEES including Willis, Love, Stover and Brunk are responsible for the failure to produce Brady materials to the defense; that although denied by GOVERNMENT EMPLOYEES, the FBI was involved in the prosecution of this case; that the GOVERNMENT EMPLOYEES' conduct caused the integrity of any future trial and any resulting conviction to be even more questionable because both the defense and the community possess the right to expect a fair process with a reliable conclusion; that the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's conduct in this case was indeed outrageous, amounting to a due process violation; and that a new trial was not an adequate sanction for this due process violation.

99.    On the heels of the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's conspiracy being exposed and the lead case of the consolidated matter against Tier 1 defendants being dismissed, the UNITED STATES in February 2018 voluntarily moved to

dismiss, with prejudice, their fabricated criminal charges against the Tier 2 defendants — false charges against all three Tiers which directly, proximately and foreseeably caused, among other things: (a) the false arrest of each Tier 1, 2, and 3 defendant; (b) the wrongful denial of bail; (c) the unlawful detainment, imprisonment and monitoring of each Tier 1, 2, and 3 defendant; (d) the egregious separation of the Tier 1, 2, and 3 defendants from their friends, family and loved ones, including, without limitation, the Bundy Family Plaintiffs, and the ongoing stress and mental, physical and emotional anguish which Plaintiffs continue to experience; (e) the corresponding loss of consortium wrongfully forced on Plaintiffs; (f) the inability for Plaintiffs to freely practice their faith and attend weekly family worship services and other church events — tenants of the LDS faith; (g) financial, occupational and reputational harm as a result of the GOVERNMENT EMPLOYEES' egregious branding and characterization of Plaintiffs in the media as domestic terrorists; (h) the loss of gainful employment, including, without limitation, future impairment for Plaintiffs' chosen professions; (i) harassment and embarrassment resulting from the GOVERNMENT EMPLOYEES' placement and continued maintenance of Plaintiffs on the No Fly List, which results in improper detainment, interrogation, delays and other travel restrictions when they attempt to fly commercially; and (j) interference with Plaintiffs' right to lawfully acquire and bear arms due to the GOVERNMENT EMPLOYEES' placement of Plaintiffs on secret lists which disqualifies and precludes them from purchasing firearms.

100.    The incarceration of Ryan Payne and Ryan Bundy caused physical harm to each, as well as to every member of their family. While incarcerated, the anxiety of their freedom being taken away, the anxiety of lack of communication with friends and family, the anxiety of always being on a lookout for potential physical danger, and lack of consistent sleep caused multiple physical manifestations.

101.   Ryan Payne's stress and anxiety caused for the first time a painful skin condition known as psoriasis, which continues to this day. In addition, he lost a significant amount of weight and also lost so much hair that he is now balding. Due to his incarceration, he also lost the opportunity to earn an income as a self-employed electrician, which historically was $50,000.00 per year.

102.   Ryan Bundy's stress and anxiety was a direct result of his detention and caused him to suffer from hair loss and weight loss. He also suffered a substantial amount of pain due to a dental issue because the institution was only willing to extract the tooth rather than treat the underlying issue. Financially, Ryan Bundy's yearlong incarceration was devastating. He is a self-employed contractor, historically making in excess of $100,000.00 per year, and his detention caused over $100,000.00 in income opportunities to be lost.

103.   Angela Bundy, due to her husband being forcibly removed from the family, all of a sudden did not have a source of income, which caused her a great amount of stress and anxiety in paying the ongoing expenses of the family. That stress and anxiety manifested itself physically for Angela Bundy because she lost weight, lost a great amount of hair, and even lost several of her teeth during her husband's incarceration. As could be expected, her mental health suffered greatly in that she was extremely emotional, cried very easily and experienced a significant amount of depression.

104.   All of Ryan Bundy's children suffered greatly, emotionally, mentally and physically as a direct result of their father's absence. Jamie, who was 16 years old, had trouble sleeping, had trouble concentrating, became extremely withdrawn and her entire personality changed. She was easily upset and was unable to control her emotions. She was forced to give up extracurricular activities, including Drill Team, that she was involved in and loved, because she

had to take on extra duties at home to help her mother in her father's absence. She also was forced to help move cattle and in doing so was hurt several times. Jamie became withdrawn and was unable to sleep and lost weight.

105.    Veyo Bundy, who was 14 years old, had trouble sleeping, was easily upset and was forced to take on more responsibility at home and on the ranch, which caused her a significant amount of stress and anxiety. Veyo also became withdrawn and lost weight due to the stress and anxiety.

106.    Jerusha Bundy, who was 12 years old, suffered a great amount of emotional distress. She had trouble sleeping and cried constantly. She suffered a significant amount of anxiety and was very scared of the thought that she may be required to testify. Other children made fun of her in relation to her father being in custody. She was also required to help move cattle on the ranch and got hurt several times. Jerusha became withdrawn and lost weight due to her anxiety.

107.    Jasmine Bundy, who was 10 years old, was emotionally and physically distraught, constantly crying. She was so upset that she could not sleep. She also had to help more with the household chores and the ranch, including moving cattle, and could not act like a normal 10-year-old child because of the extra responsibilities she had to take on.

108.    Oak Bundy, who was 9 years old, struggled to sleep and experienced significant nightmares. He was very insecure and experienced significant anxiety when he saw anyone taking pictures of him or of his surroundings.

109.    Chloee Bundy, who was 6 years old, was emotional all of the time. She struggled to sleep and each day when she would arrive home from school, she would ask if her dad was

home. When he was not, she could not control her emotions and cried uncontrollably. She was unable to function and had to go to therapy.

110. M.B., a minor child, who was 4 years old, had trouble sleeping, cried a lot and began losing his hair from the stress of not having his father at home. He began having behavior issues which, prior to his father's absence, he did not have.

111. S.B., a minor child, who was 1½ years old, began having reoccurring nightmares about her mother getting arrested and being left alone when she realized what had happened. She did not remember her father and had to start a new relationship with him when her father finally came home.

**g. The GOVERNMENT EMPLOYEES' Direction and Pressure Upon Federal Prosecutors**

112. From the outset of the Cattle Impoundment Operation and continuing through the indictment and prosecution of Plaintiffs Ryan Bundy and Ryan Payne in the Underlying Action, the GOVERNMENT EMPLOYEES Willis, Love, Stover, and Brunk did not merely provide information to federal prosecutors — they directed, pressured, and controlled the prosecution of Plaintiffs. Specifically, the GOVERNMENT EMPLOYEES were physically present at the Bundy Ranch and the surrounding Gold Butte area, alongside federal prosecutors, before, during, and after the events giving rise to the charges against Plaintiffs. Photographic and testimonial evidence confirm that law enforcement and prosecutors operated in a unified, coordinated manner from the outset of the Underlying Action, leaving no meaningful separation between the investigative function and the prosecutorial function. The GOVERNMENT EMPLOYEES' openly stated animus toward Plaintiffs — including BLM SAC Love's expressed intention to kick members of the Bundy family in the mouth during their arrest, his maintenance of a Kill

Book in which he bragged about causing individuals to commit suicide, his maintenance of a kill list for the Bundys, and the FBI's maintenance of an Arrest Tracking Wall on which photographs of Plaintiff Ryan Bundy and other family members were marked with an "X" — establishes that the decision to charge Plaintiffs was not the product of independent prosecutorial judgment, but was instead driven by and was the direct result of law enforcement direction, request, and pressure upon federal prosecutors, within the meaning of *M & R Inv. Co., Inc. v. Mandarino*, 748 P.2d 488, 494 (Nev. 1987). The GOVERNMENT EMPLOYEES' collusive environment was so pervasive and so thoroughly documented — including by BLM Special Agent Larry Wooten in the Wooten Memo — that no reasonable inference of independent prosecutorial judgment can be drawn from the facts alleged herein. Furthermore, the GOVERNMENT EMPLOYEES continued to pressure and control the prosecution after the indictment was obtained by systematically withholding exculpatory evidence, including the BLM threat assessments, the surveillance camera footage, and Dave Bundy's iPad, and by lying to prosecutors and the Court about the use of government snipers and the scope of surveillance of the Bundy Ranch. This continuing pattern of direction, pressure, and concealment ensured that federal prosecutors were, at all material times, operating on a false and fabricated record manufactured entirely by the GOVERNMENT EMPLOYEES, such that the prosecution cannot be said to have exercised independent judgment at any stage of the Underlying Action.

**h. The GOVERNMENT EMPLOYEES' False Testimony and Fabricated Evidence Presented Directly to the Grand Jury**

113.    The central and indispensable allegation upon which the GOVERNMENT EMPLOYEES obtained grand jury indictments against Plaintiffs Ryan Bundy and Ryan Payne was the false claim that Plaintiffs fabricated, exaggerated, and disseminated lies about the

presence of government snipers at the Bundy Ranch and the surrounding Gold Butte area during the April 2014 Cattle Impoundment Operation. Specifically, the indictment in the Underlying Action expressly alleged that Plaintiff Ryan Payne posted messages to followers falsely stating, among other things, that the Bundy Ranch was surrounded by BLM snipers, that the Bundy family was isolated, and that the BLM wanted Cliven Bundy dead. This allegation — that Plaintiffs' statements about snipers were false — was the lynchpin of the conspiracy charges and the use-of-force charges against Plaintiffs, because it was the premise upon which the GOVERNMENT EMPLOYEES characterized Plaintiffs' presence at the protest as criminal rather than constitutionally protected. Without the false denial of snipers, Plaintiffs' conduct — coming to the Bundy Ranch to protest the Cattle Impoundment Operation and to protect the Bundy family from what they reasonably and correctly believed was an imminent threat of lethal government force — was entirely lawful and could not form the basis for any of the charges in the indictment.

114.    The GOVERNMENT EMPLOYEES knowingly, intentionally, and willfully presented false testimony and fabricated evidence directly to the Grand Jury — both on June 29, 2015, and on September 16, 2015, and again on March 2, 2016 — denying the existence of government snipers. On September 16, 2015, Officer Stover testified before the Grand Jury that the operational plan did not include the use of snipers, and that the purported use of snipers was merely a story concocted by the Bundys and their supporters — testimony Officer Stover knew to be false, as numerous federal agents and snipers were in fact positioned on hillsides surrounding the Bundy Ranch and the Cattle Impoundment Operation's staging area during the April 2014 operation. On June 29, 2015, Agent Willis likewise knowingly presented false testimony to the Grand Jury, and on March 2, 2016, Agent Willis again knowingly and

intentionally provided perjurious testimony to the Grand Jury, each time concealing the true nature of the government's armed deployment at the Bundy Ranch. These false statements were made directly to the Grand Jury in the grand jury proceedings that preceded the indictment of Plaintiffs and were not statements made in post-indictment criminal proceedings. Simultaneously, the GOVERNMENT EMPLOYEES withheld from the Grand Jury the existence of the FBI surveillance camera positioned on a hill northeast of the Bundy home — with a live feed to BLM's command center — evidence that was directly material to the specific charges against Plaintiffs, as it confirmed that the GOVERNMENT EMPLOYEES had deployed a covert surveillance apparatus targeting the Bundy family, consistent with Plaintiffs' claims and wholly inconsistent with the GOVERNMENT EMPLOYEES' narrative presented to the Grand Jury that Plaintiffs had fabricated the threat environment. The GOVERNMENT EMPLOYEES also withheld from the Grand Jury the BLM threat assessments, which in fact established that the Bundys would not engage in potential acts of violence — evidence directly contrary to the testimony Officer Stover provided to the Grand Jury regarding Plaintiffs' propensity for violence and directly relevant to the elements of the conspiracy and assault charges with which Plaintiffs were indicted. Without this false testimony and without the concealment of this exculpatory evidence, the Grand Jury would have been presented with the truth: that government snipers were in fact deployed at the Bundy Ranch, that Plaintiffs' statements about the threat environment were accurate, that Plaintiffs were justified in responding to a genuine and government-created danger, and that Plaintiffs' presence at the protest was a constitutionally protected exercise of their First Amendment rights. Accordingly, the grand jury indictments against Plaintiffs Ryan Bundy and Ryan Payne were obtained solely through the GOVERNMENT EMPLOYEES' presentation of false testimony and fabricated evidence directly

to the Grand Jury, and through the concealment from the Grand Jury of exculpatory evidence, all of which was directly relevant to the specific elements of the conspiracy, assault, obstruction, and use-of-force charges with which Plaintiffs were indicted. Without the GOVERNMENT EMPLOYEES' false denials of the presence of snipers presented directly to the Grand Jury, there was no probable cause to indict or prosecute Plaintiffs for any of those charges.

**h. Plaintiffs' Actual Innocence and the Favorable Termination of the Underlying Action**

115.   The Underlying Action was terminated in a manner that reflects the merits of the action and affirmatively establishes Plaintiffs' innocence of all charged conduct. The indictment against Plaintiffs Ryan Bundy and Ryan Payne in the Underlying Action was dismissed with prejudice, and that dismissal with prejudice was upheld on appeal to the United States Court of Appeals for the Ninth Circuit in *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). The dismissal was not on technical grounds, was not for procedural reasons, and was not for any reason that is inconsistent with Plaintiffs' innocence. Rather, the dismissal was compelled by, and directly reflected, the merits of the prosecution and Plaintiffs' innocence of all charged conduct, as set forth more fully herein.

116.   The central factual allegation underlying all charges against Plaintiffs Ryan Bundy and Ryan Payne was that their statements about the presence of government snipers surrounding the Bundy Ranch were false, and that Plaintiffs' assembly, protest, and bearing of arms in response to those alleged falsehoods therefore constituted criminal conduct. That central allegation was itself false, and was proven to be false at the Tier 1 evidentiary hearing, when it was irrefutably established that BLM snipers were in fact deployed and positioned around the Bundy Ranch during the April 2014 Cattle Impoundment Operation — exactly as Plaintiff Ryan

Bundy had stated and as Plaintiff Ryan Payne had conveyed to those who responded. The GOVERNMENT EMPLOYEES knowingly and intentionally hid this truth from the Grand Jury, from prosecutors, and from the Court, in violation of their Brady obligations, as Chief Judge Navarro expressly found. The dismissal with prejudice, affirmed by the Ninth Circuit in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020), thus was grounded in the irrefutable establishment of facts that directly and affirmatively demonstrate Plaintiffs' innocence: the snipers existed, Plaintiff Bundy's warnings were true, and Plaintiffs' response was lawful.

117.    Plaintiff Ryan Bundy was justified in conveying to others, including Plaintiff Ryan Payne, that he and his family were surrounded by government snipers and in imminent danger of lethal force. That statement was not a fabrication — it was the truth, as conclusively proven at the Tier 1 evidentiary hearing and recognized in the dismissal of the Underlying Action. Plaintiff Ryan Payne was likewise legally justified in responding to that accurate call for assistance, as a person acting in defense of themselves and others.  They all acted in a manner in which a reasonable person would have acted, with an understanding that the threat of lethal force was genuine and imminent. Both Plaintiffs' assembly, presence, and bearing of arms at the Bundy Ranch were constitutionally protected under the First and Second Amendments to the United States Constitution, The Nevada Constitution and Nevada law.  Their conduct at no time exceeded the bounds of those protected rights. Both Plaintiffs were and remain legally innocent of every charge brought against them in the Underlying Action. But for the GOVERNMENT EMPLOYEES' outrageous and unconstitutional concealment of the truth about the presence of snipers — evidence that supported a complete defense of justification and self-defense — no charges could have been filed, and no grand jury would have found probable cause to indict. The dismissal with prejudice of all charges against Plaintiffs, affirmed by the United States Court of

38

Appeals for the Ninth Circuit in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020), is therefore a termination reflecting the merits of the action and Plaintiffs' innocence of the misconduct charged, and constitutes a favorable termination for purposes of Plaintiffs' malicious prosecution claim.  The Nevada Legislature codified the presumption of innocence.  Accordingly, under NRS 175.201 the plaintiffs are presumed innocent until the contrary is proved by competent evidence beyond a reasonable doubt.  As this case was dismissed with prejudice, the Plaintiffs remain presumed innocent.

### i. The GOVERNMENT EMPLOYEES' Constitutional & Statutory Violations

118.    As a direct, proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' Willis, Love, Stover and Brunk's conspiracy — one that involved multiple egregious acts performed by these duly authorized representatives in their official capacity, that is, within the scope and course of their employment with their respective federal agencies, and performed in furtherance of that conspiracy — along with other independent, unprivileged acts performed by BLM SAC Love, Officers Stover and Brunk, and Agent Willis, Plaintiffs' rights were knowingly, intentionally and willfully violated, infringed upon and impaired, including, without limitation:

A. The Plaintiffs' right to assemble together, exercise free speech and lawfully protest against the GOVERNMENT EMPLOYEES' egregious conduct and its wrongful curtailment of their rights, in contravention of the First Amendment to the United States Constitution; Article 1, Sections 1 (Inalienable Rights), 9 (Liberty of Speech) and 10 (Right to Assemble & Petition) of the Nevada Constitution; and Nevada Revised Statute 41.637's protection of good faith communications in furtherance of Plaintiffs' right to petition or the right to free speech in direct connection with an issue of public concern,

including any communication made in direct connection with an issue of public interest in a place open to the public or in a public forum.

B. Plaintiffs' right to lawfully purchase, keep and bear arms as provided for in the Second Amendment to the United States Constitution; Article 1, Section 11 (Right to Keep & Bear Arms; Civil Power Supreme) of the Nevada Constitution; and NRS 244.364, which vests control over the regulation of, and policies concerning, firearms, firearm accessories and ammunition with the Nevada State Legislature, including, without limitation, the regulation of transfers, sales and purchases of same.

C. The GOVERNMENT EMPLOYEES' fabricated rogue detainments, preclusion of bail, and malicious prosecution of the Plaintiffs — without probable cause or due process of law — deprived the Plaintiffs of their life, liberty and property rights, and constituted cruel and unusual punishment in contravention of the Fourth, Fifth and Eighth Amendments to the United States Constitution; Article 1, Section 1 (Inalienable Rights), Section 6 (Excessive Bail & Fines), Section 8 (Rights of Accused in Criminal Prosecutions) and Section 18 (Unreasonable Seizure & Search; Issuance of Warrants) of the Nevada Constitution; NRS 199.310 (Malicious Prosecution) and NRS 200.460 (False Imprisonment).

D. The GOVERNMENT EMPLOYEES' abhorrent and outrageous conduct — conduct which irrefutably shocks the conscience — egregiously deprived the Plaintiffs of their life, liberty and property rights in contravention of substantive and procedural due process rights, guaranteed to them by the Fifth Amendment of the United States Constitution and Article 1, Section 8 of the Nevada Constitution. Federal agents called

Plaintiff Ryan Bundy, his family, and his supporters derogatory, vile terms and names, including retards, rednecks, tractor-face, and inbred.

E. The GOVERNMENT EMPLOYEES' unlawful arrest, detainment and incarceration of the Plaintiffs also precluded them from freely practicing their faith and attending weekly family worship services and other church events — in violation of the First and Eighth Amendments to the United States Constitution, and Article 1, Section 4 (Liberty of Conscience) and Section 6 (Cruel & Unusual Punishment) of the Nevada Constitution. Notably, throughout their incarceration, prison guards, at the direction of the GOVERNMENT EMPLOYEES, interfered with and ridiculed the Plaintiffs' LDS garments — undergarments worn under their clothes as a sacred symbol of their personal commitment to God and their commitment to fidelity. Plaintiff Ryan Bundy was subjected to stereotyping and subsequent prosecution by the GOVERNMENT EMPLOYEES in retaliation for his exercise of his faith and membership in the Church of Jesus Christ of Latter-Day Saints, as federal agents involved in the Standoff and the aftermath exhibited a deep animus against members of the Church of Jesus Christ of Latter-Day Saints. By subjecting Plaintiff Ryan Bundy to criminal prosecution because of his faith and membership in the Church of Jesus Christ of Latter-Day Saints, the exercise of his faith was substantially burdened. By facing criminal prosecution, Plaintiff Ryan Bundy was forced, against his will, to violate his deeply held religious beliefs and convictions, until such time as he refused to further do so, which increased the cruel and unusual punishments heaped upon him in the form of solitary confinement, deprivation of rights of due process, physical injury, and many other violations.

### j. Exhaustion of Administrative Remedies

119.   Pursuant to 28 U.S.C. § 1346(b), Plaintiffs timely and properly submitted a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies — that is, the Federal Bureau of Investigation, the Bureau of Land Management and the United States Department of Justice — on or about February 3, 2020, including, without limitation, an administrative tort claim demand package to the U.S. Department of Justice, Civil Division, Torts Branch, Federal Tort Claims Act section ("FTCA Section"), which the U.S. Department of Justice acknowledged had all been received by February 6, 2020.

120.   Since the FTCA Section did not act within six (6) months, its failure to issue a decision is treated as a final decision, enabling Plaintiffs herein to proceed with their claims against the United States. See 28 U.S.C. § 2675(a).

121.   Plaintiffs, therefore, have fully satisfied and exhausted their administrative obligations to present their FTCA claims to the Court and, as such, their FTCA Claims are properly before the Court, this Court possesses exclusive subject matter jurisdiction over same, and they are ripe for adjudication.

### FIRST CLAIM FOR RELIEF
#### (Federal Tort Claims Act Claims — 28 U.S.C. § 2671 et seq.)

122.   Plaintiffs fully incorporate herein by reference all allegations contained in paragraphs 1 through 118 of this Complaint.

123.   Pursuant to 28 U.S.C. § 1346(b), federal district courts have jurisdiction over a certain category of claims for which the UNITED STATES has waived its sovereign immunity and rendered itself liable, including, without limitation, claims that are: against the United States, for money damages, for injury or loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. F.D.I.C. v. Meyer, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

124.    A claim comes within this jurisdictional grant — and thus is cognizable under 28 U.S.C. § 1346(b) — if it is actionable under that section, and a claim is actionable if it alleges the six elements outlined above. F.D.I.C. v. Meyer, 510 U.S. 471, 477 (1994) (citing Loeffler v. Frank, 486 U.S. 549 (1988)).

125.    The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., is the exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against Federal employees who commit torts while acting within the scope and course of their employment (28 U.S.C. § 2679(b)(1)).

126.    As set forth above, the GOVERNMENT EMPLOYEES engaged in certain tortious acts in their official capacities.

127.    With regard to the GOVERNMENT EMPLOYEES' tortious conduct that was performed while they were acting within the scope of their official offices or employment at the time of the incident out of which the Plaintiffs' claims arose, the UNITED STATES is solely liable for that conduct as mandated by 28 U.S.C. § 2679(d)(2) and the Federal Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

128.    Similarly, Plaintiffs' exclusive remedy for their tort-based claims against the GOVERNMENT EMPLOYEES' employers — that is, the DOI, BLM and FBI — is the UNITED STATES, pursuant to 28 U.S.C. § 2679(a).

129.    To that end, 28 U.S.C. § 2680(h) expressly provides that the UNITED STATES is also liable for certain intentional torts that are based on the acts or omissions of an investigative

or law enforcement officer and include any claim arising out of false imprisonment, false arrest, and malicious prosecution. Millbrook v. U.S., 569 U.S. 50, 52 (2013) (citing 28 U.S.C. § 2680(h)); see also Levin v. United States, 568 U.S. 503 (2013).

130.    Here, Plaintiffs have valid State-law tort claims arising out of, related to and connected with the GOVERNMENT EMPLOYEES' tortious conduct — for purposes of this paragraph limited to DOI/FBI agents, BLM agents, and officers of those agencies — that was performed in their official capacity and during the scope and course of their employment with the DOI/BLM and FBI, including, without limitation, the following claims:

**A. Malicious Prosecution**

131.    In Nevada, a person who maliciously and without probable cause therefor, causes or attempts to cause another person to be arrested or proceeded against for any crime of which that person is innocent, is liable for malicious prosecution. NRS 199.310. To state a claim for malicious prosecution under Nevada law, a Plaintiff must allege: (1) that the defendant lacked probable cause to initiate a prosecution; (2) malice; (3) the prior criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages. Anderson v. United States, 2019 WL 6357256, at *2 (D.Nev. 2019) (quoting LaMantia v. Redisi, 118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002)).

132.    With respect to the element of independent prosecutorial judgment, Plaintiffs affirmatively allege that the prosecution of Plaintiffs Ryan Bundy and Ryan Payne was commenced because of direction, request, and pressure from the GOVERNMENT EMPLOYEES, within the meaning of M & R Inv. Co., Inc. v. Mandarino, 748 P.2d 488, 494 (Nev. 1987). Specifically, from the outset of the Cattle Impoundment Operation, the GOVERNMENT EMPLOYEES were physically present at the Bundy Ranch and surrounding

Gold Butte area alongside federal prosecutors, and photographic and testimonial evidence confirms that the GOVERNMENT EMPLOYEES and prosecutors operated in a unified, coordinated manner that left no meaningful separation between the investigative and prosecutorial functions. The GOVERNMENT EMPLOYEES' pervasive and documented animus toward Plaintiffs — including BLM SAC Love's kill list for the Bundys, the FBI's Arrest Tracking Wall marking Plaintiffs with an "X," and the GOVERNMENT EMPLOYEES' systematic fabrication and concealment of evidence — establishes that the prosecution was not the product of independent prosecutorial judgment but was the direct result of law enforcement direction and pressure, as thoroughly documented in the Wooten Memo. Furthermore, the GOVERNMENT EMPLOYEES continued to direct and control the prosecution after the indictment was obtained by systematically withholding exculpatory evidence from prosecutors and the Court, ensuring that prosecutors were at all material times operating on a false and fabricated record manufactured entirely by the GOVERNMENT EMPLOYEES.

133.    With respect to the element of probable cause, Plaintiffs affirmatively allege that the grand jury indictments against Plaintiffs Ryan Bundy and Ryan Payne were obtained solely through the GOVERNMENT EMPLOYEES' knowing and intentional presentation of false testimony and fabricated evidence directly to the Grand Jury — including Officer Stover's false testimony on September 16, 2015, that the operational plan did not include the use of snipers, and Agent Willis' false and perjurious testimony on June 29, 2015, and again on March 2, 2016 — each of which was presented directly to the Grand Jury in the grand jury proceedings that preceded the indictment. The central and indispensable allegation supporting all charges against Plaintiffs was that their statements about the presence of government snipers were false. That allegation was itself false, as was irrefutably established during the Tier 1 evidentiary hearing

and recognized in the dismissal with prejudice affirmed by the Ninth Circuit in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020). The GOVERNMENT EMPLOYEES also withheld from the Grand Jury the FBI surveillance camera evidence and the BLM threat assessments — both of which were directly exculpatory and directly relevant to the specific elements of the conspiracy, assault, obstruction, and use-of-force charges with which Plaintiffs were indicted. Without the GOVERNMENT EMPLOYEES' false denials of the presence of snipers presented directly to the Grand Jury, and without the concealment from the Grand Jury of the surveillance camera evidence and the BLM threat assessments, there was no probable cause to indict or prosecute Plaintiffs. Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. Awabdy v. City of Adelanto, 368 F.3d 1062, 1067 (9th Cir. 2004). Plaintiffs have done precisely that here.

134.    With respect to the element of favorable termination, Plaintiffs affirmatively allege that the dismissal with prejudice of all charges against Plaintiffs Ryan Bundy and Ryan Payne constitutes a favorable termination that reflects the merits of the Underlying Action and affirmatively establishes Plaintiffs' innocence of all charged conduct, within the meaning of Mills v. City of Covina, 921 F.3d 1161, 1170-71 (9th Cir. 2019). The dismissal was not on technical grounds, was not for procedural reasons, and was not for any reason inconsistent with Plaintiffs' innocence. The dismissal with prejudice was compelled by, and directly reflected, the irrefutable establishment at the Tier 1 evidentiary hearing that the BLM did, in fact, deploy snipers and use excessive force at the Bundy Ranch during the April 2014 Cattle Impoundment Operation — the very facts that Plaintiffs had alleged and that the GOVERNMENT EMPLOYEES had knowingly, intentionally and willfully concealed from the Grand Jury, from

prosecutors, and from the Court. The Ninth Circuit affirmed the dismissal with prejudice in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020), further establishing that the termination of the Underlying Action was on the merits. Because the central premise of all charges against Plaintiffs was that their statements about the snipers were false — and because those statements were proven to be true — the termination of the Underlying Action left no doubt as to Plaintiffs' innocence or as to their lack of responsibility for the criminal conduct charged. Plaintiff Ryan Bundy was legally justified and constitutionally protected when he truthfully conveyed that he and his family were surrounded by government snipers and in imminent danger of lethal force, as that statement was accurate and its communication was protected by the First and Second Amendments to the United States Constitution. Plaintiff Ryan Payne was likewise legally justified and constitutionally protected when he responded to that accurate call for assistance and assembled at the Bundy Ranch in protest of the GOVERNMENT EMPLOYEES' unconstitutional and violent conduct. Both Plaintiffs were at all times acting within their constitutionally protected rights, and their innocence of all charged conduct is affirmatively established by the facts set forth herein and by the dismissal with prejudice of the Underlying Action affirmed in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020). But for the GOVERNMENT EMPLOYEES' outrageous, unconstitutional, and systematic concealment of the truth about the deployment of snipers — evidence that established a complete defense of justification and that directly negated each element of the charges against Plaintiffs — no charges could have been brought and no grand jury would have found probable cause to indict.

**B. Intentional Infliction of Emotional Distress**

135.    In Sheehan v. U.S., 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of emotional

distress claim in FTCA actions. In Nevada, the elements of a cause of action for intentional infliction of emotional distress are: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) the plaintiff's having suffered severe or extreme emotional distress; and (3) actual or proximate causation. Dillard Dept. Stores, Inc. v. Beckwith, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev. 1999). Extreme and outrageous conduct is that which is atrocious, intolerable or outside all possible bounds of decency. Posadas v. City of Reno, 851 P.2d 438, 444 (Nev. 1993). Plaintiffs here affirmatively allege that the GOVERNMENT EMPLOYEES' conduct — that is, those acts performed in their official capacity, scope and employment with the DOI/BLM and FBI — were: (1) extreme and outrageous and accomplished with the intent, or reckless disregard for, causing Plaintiffs' emotional distress, as established by the GOVERNMENT EMPLOYEES' maintenance of a kill list for the Bundys, the FBI's Arrest Tracking Wall, BLM SAC Love's Kill Book, the systematic fabrication and concealment of evidence, the monitoring of post-arrest jail calls for the purpose of mocking Plaintiffs, the planting of informants and manufacturing of false inmate testimony, the Longbow Productions scheme, and all other conduct described herein, which collectively constitutes conduct outside all possible bounds of decency; (2) the Plaintiffs, and each of them, in fact have suffered, and continue to suffer from, severe and extreme emotional distress, which physically manifested in common ways to all Plaintiffs, as well as specifically to each Plaintiff as outlined hereinabove; and (3) said severe and extreme emotional distress was actually and proximately caused by such extreme and outrageous conduct. Because Plaintiffs have affirmatively alleged the absence of probable cause in support of their malicious prosecution claim, and because the dismissal of the Underlying Action was on the merits and reflected Plaintiffs' innocence as set forth herein, the prosecution of Plaintiffs was not based on probable

cause, and accordingly the GOVERNMENT EMPLOYEES' arrest, indictment, and subjection of Plaintiffs to pretrial detention constitutes extreme and outrageous conduct for purposes of their intentional infliction of emotional distress claim. As a result, the UNITED STATES is, and remains, liable for Plaintiffs' damages.

### C. Loss of Consortium

136.    Nevada law recognizes that an action for loss of consortium is derivative of the primary harm to the physically injured spouse or parent. Fakoya v. County of Clark, 2014 WL 5020592, at *9 (D.Nev. 2014) (citing Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cnty. of Clark, 122 Nev. 466, 134 P.3d 111 (Nev. 2006)). Here, Plaintiffs affirmatively allege that as a direct, proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' tortious conduct, including, without limitation, the physical injuries sustained by Plaintiffs Dave Bundy and Ryan Bundy, the Bundy Family Plaintiffs have validly stated claims for relief against the UNITED STATES for those acts performed by the GOVERNMENT EMPLOYEES in their official capacity, within the scope and course of their employment. Because Plaintiffs have affirmatively alleged valid and sufficient claims for malicious prosecution and intentional infliction of emotional distress, as set forth above, the Bundy Family Plaintiffs' loss of consortium claims are properly derivative of those primary claims. Plaintiffs affirmatively allege that, as a direct, proximate, and foreseeable cause of the aforementioned injuries: (1) Plaintiff Angela Bundy, the wife of Plaintiff Ryan Bundy, lost the love, affection, protection, support, services, companionship, care, society and sexual relations of her husband, the physical manifestations of which are specifically identified hereinabove, all of which warrant an award of damages; and (2) Plaintiffs Jamie Bundy, Veyo Bundy, Jerusha Bundy, Jasmine Bundy, Oak Bundy, Chloee Bundy, M.B., a minor child, and S.B., a minor child also lost the

love, affection, protection, support, care, society and parental guidance of their father, Plaintiff Ryan Bundy, the physical manifestations of which are specifically identified hereinabove, all of which warrant an award of damages.

137.    Plaintiffs further allege that as a direct, proximate, and foreseeable cause of certain GOVERNMENT EMPLOYEES' official capacity conduct performed in the scope and course of their employment with the DOI/BLM and FBI, Plaintiff Angela Bundy suffered severe emotional, physical, mental, occupational, and financial distress as specifically identified hereinabove — damages and injuries which continue to this day.

**D. False Imprisonment**

138.    Nevada law provides that false imprisonment arising from a false arrest occurs when a plaintiff's liberty is restrained under the probable imminence of force without any legal cause or justification. Jordan v. State ex rel. Dept. of Motor Vehicles and Public Safety, 121 Nev. 44, 69, 110 P.3d 30, 48 (2005). To sustain a claim of false imprisonment, a plaintiff must prove: (1) the defendant intended to confine the plaintiff within boundaries fixed by the defendant; (2) the defendant's act directly or indirectly resulted in the confinement of the plaintiff; and (3) the plaintiff was conscious of the confinement or harmed by it. Id. This claim is expressly cognizable against the UNITED STATES under the law enforcement proviso of 28 U.S.C. § 2680(h), which waives sovereign immunity for claims arising out of false imprisonment committed by investigative or law enforcement officers of the United States Government. Millbrook v. U.S., 569 U.S. 50, 52 (2013).

139.    With respect to the first element, Plaintiffs Ryan Bundy and Ryan Payne affirmatively allege that the GOVERNMENT EMPLOYEES Willis, Love, Stover, and Brunk acted with the specific and deliberate intent to confine Plaintiffs within boundaries fixed by the

50

GOVERNMENT EMPLOYEES themselves. The confinement of Plaintiffs was not incidental to any lawful law enforcement purpose — it was the deliberate objective of the GOVERNMENT EMPLOYEES' coordinated conspiracy, as evidenced by the FBI's Arrest Tracking Wall bearing photographs of Plaintiff Ryan Bundy and his family members marked with an "X," BLM SAC Love's maintenance of a kill list for the Bundys, and BLM SAC Love's expressed intention to physically assault members of the Bundy family upon their arrest, all as documented in the Wooten Memo authored in November 2017. The GOVERNMENT EMPLOYEES fixed the specific boundaries of Plaintiffs' confinement by directing their incarceration at a punitive federal-contracted prison in Pahrump, Nevada, directing the unlawful denial of bail, and directing the ongoing monitoring of Plaintiffs' post-arrest jail telephone communications.

140.    With respect to the second element, the GOVERNMENT EMPLOYEES' acts directly and indirectly resulted in Plaintiffs' confinement. Directly, Agent Willis caused arrest warrants to be issued against Plaintiffs on or around February 2016 by knowingly using false, fabricated, and manufactured evidence and withholding exculpatory evidence, as alleged in paragraph 75 of this Complaint, resulting in Plaintiffs being taken into custody and confined for nearly two years. Indirectly, the GOVERNMENT EMPLOYEES prolonged Plaintiffs' confinement by continuing to withhold extensive exculpatory evidence — including Dave Bundy's iPad, the BLM threat assessments, and the FBI surveillance camera evidence — from Plaintiffs, their counsel, and the Court throughout the pendency of the Underlying Action, and by planting informants and manufacturing false inmate testimony as alleged in paragraphs 47 and 48 of this Complaint.

141.    With respect to the third element, Plaintiffs Ryan Bundy and Ryan Payne were acutely conscious of their confinement and were profoundly harmed by it in every dimension of

their lives. As alleged in paragraphs 97 through 99 of this Complaint, both Plaintiffs suffered severe and lasting physical, emotional, occupational, and financial harm, including chronic physical ailments, significant weight and hair loss, dental injury, and the combined loss of over $150,000.00 in income. The confinement was without any legal cause or justification whatsoever, as the arrest warrants and indictments upon which it was based were obtained solely through the GOVERNMENT EMPLOYEES' presentation of false testimony and fabricated evidence directly to the Grand Jury and their systematic concealment of exculpatory evidence establishing Plaintiffs' complete innocence, as recognized in the dismissal with prejudice of all charges affirmed by the United States Court of Appeals for the Ninth Circuit in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020).

### E. Abuse of Process

142.    Nevada law provides that a claim for abuse of process requires a plaintiff to establish: (1) an ulterior purpose behind issuing process; and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding. Land Baron Invs. v. Bonnie Springs Family LP, 131 Nev., Adv. Op. 69, 356 P.3d 511, 519 (2015). This claim is expressly cognizable against the UNITED STATES under the law enforcement proviso of 28 U.S.C. § 2680(h), which expressly waives sovereign immunity for claims arising out of abuse of process committed by investigative or law enforcement officers of the United States Government. Millbrook v. U.S., 569 U.S. 50, 52 (2013).

143.    With respect to the first element, Plaintiffs Ryan Bundy and Ryan Payne affirmatively allege that the GOVERNMENT EMPLOYEES Willis, Love, Stover, and Brunk harbored multiple ulterior purposes in initiating and maintaining the legal process against Plaintiffs in the Underlying Action, none of which constituted a legitimate law enforcement

objective. As alleged throughout this Complaint, the GOVERNMENT EMPLOYEES initiated and maintained the criminal process against Plaintiffs not to vindicate any genuine violation of federal law, but for the ulterior purposes of: eliminating ranching operations in the Gold Butte region and thereby acquiring the Bundy family's private water rights for commercial development or other land-use purposes, as alleged in paragraph 19 of this Complaint; punishing Plaintiffs for their religious beliefs and membership in the Church of Jesus Christ of Latter-Day Saints, as alleged in paragraph 115(E) of this Complaint; retaliating against Plaintiffs for their constitutionally protected exercise of their First and Second Amendment rights in protesting the GOVERNMENT EMPLOYEES' unconstitutional conduct during the April 2014 Cattle Impoundment Operation; and satisfying the personal animus of BLM SAC Love and other GOVERNMENT EMPLOYEES toward the Bundy family, as documented in the Wooten Memo authored in November 2017 and evidenced by BLM SAC Love's maintenance of a kill list for the Bundys, his Kill Book, and the FBI's Arrest Tracking Wall bearing photographs of Plaintiff Ryan Bundy and his family members marked with an "X." These ulterior purposes, and not any legitimate prosecutorial objective, were the true driving force behind the issuance and maintenance of all process against Plaintiffs in the Underlying Action.

144.    With respect to the second element, Plaintiffs Ryan Bundy and Ryan Payne affirmatively allege that the GOVERNMENT EMPLOYEES committed multiple willful acts in the use of the legal process that were not proper in the regular conduct of the proceeding. First, as alleged in paragraphs 53 through 56 of this Complaint, Agent Willis directed the Longbow Productions undercover FBI operation — in which masquerading FBI agents falsely posed as a film crew, enticed Plaintiffs and their supporters with alcohol, money, and other goods, and asked leading questions in staged interviews that were then selectively edited and used against

Plaintiffs in the Underlying Action — a use of federal investigative process that was wholly improper in the regular conduct of a criminal proceeding. Second, as alleged in paragraphs 47 and 48 of this Complaint, the GOVERNMENT EMPLOYEES directed that informants be planted among Plaintiffs during their incarceration, offered other inmates immediate release from custody in exchange for false testimony against Plaintiffs, and prepared fabricated investigative documents for those inmates to sign — each of which constitutes a willful and improper use of the legal process for the purpose of manufacturing a false evidentiary record to sustain the Underlying Action. Third, as alleged in paragraphs 34 and 79 of this Complaint, the GOVERNMENT EMPLOYEES intentionally and systematically concealed exculpatory evidence — including Dave Bundy's iPad, the BLM threat assessments, and the FBI surveillance camera evidence — from Plaintiffs, their counsel, and the Court throughout the pendency of the Underlying Action, willfully corrupting the legal process for the ulterior purpose of sustaining a prosecution the GOVERNMENT EMPLOYEES knew to be entirely without merit. Fourth, as alleged in paragraph 28 of this Complaint, the GOVERNMENT EMPLOYEES directed the unauthorized and unlawful monitoring of post-arrest jail telephone calls between Plaintiff Ryan Bundy and Plaintiff Angela Bundy, and between Plaintiff Ryan Payne and his wife, for the apparent purpose of mocking their private expressions of anguish — a willful use of federal investigative process entirely outside the proper conduct of any legitimate criminal proceeding. Each of these acts represents a deliberate perversion of the legal process for purposes wholly foreign to its intended use, and collectively they establish that the GOVERNMENT EMPLOYEES' use of the legal process against Plaintiffs was, from its inception through its ultimate dismissal with prejudice affirmed by the United States Court of Appeals for the Ninth

Circuit in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020), an abuse of process in violation of Nevada law and the constitutional rights of Plaintiffs Ryan Bundy and Ryan Payne.

**TOLLING**

145.     The claims set forth herein, as a matter of fact and law, were tolled to the extent they were not presented within an applicable two (2) year statute of limitations period. Throughout the pendency of the Underlying Action, the GOVERNMENT EMPLOYEES actively concealed the true nature and scope of their misconduct — including the fabrication of evidence, the subornation of perjury before the Grand Jury, and the concealment of exculpatory evidence — thereby preventing Plaintiffs from discovering the factual basis for each of the claims set forth herein until that misconduct was exposed through the evidentiary proceedings before Chief Judge Navarro and the subsequent dismissal with prejudice of the Underlying Action affirmed in United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020).

146.     Those claims of malicious prosecution were tolled as the GOVERNMENT EMPLOYEES continued to seal, fabricate, deny discovery, and frustrate Plaintiffs' abilities to discover and bring such claims during the entire pendency of the malicious prosecution. The malicious prosecution claim did not accrue, and the applicable statute of limitations did not begin to run, until the dismissal with prejudice of the Underlying Action on February 7, 2018, at the earliest, and any remaining limitations period was further tolled by the GOVERNMENT EMPLOYEES' ongoing concealment of the scope and nature of their misconduct throughout the pendency of the Underlying Action.

147.     Those claims set forth herein relating to the intentional infliction of emotional distress caused to the Plaintiffs were tolled during the time periods set forth herein, and furthermore acted as continuing torts throughout those time periods, continuing to cause severe

emotional distress damages to each of the Plaintiffs through the date of this filing, including as a result of the GOVERNMENT EMPLOYEES' ongoing placement and maintenance of Plaintiffs on the No Fly List and on secret lists precluding Plaintiffs from purchasing firearms, as alleged in paragraph 96(i) and (j) of this Complaint.

148.    Those claims set forth herein relating to loss of consortium damages against the UNITED STATES were tolled through the dismissal of the Government's criminal case against Plaintiffs on February 7, 2018, as those claims act as continuing torts relating to malicious prosecution and intentional infliction of emotional distress, claims which are themselves timely as set forth herein, and continue to accrue to the extent that the ongoing harms described in paragraphs 100 through 108 of this Complaint persist to this day.

149.    Those claims set forth herein relating to false imprisonment were tolled throughout the entire pendency of the Underlying Action, as Plaintiffs could not reasonably have discovered the full factual basis for their false imprisonment claim until the GOVERNMENT EMPLOYEES' fabrication of evidence and concealment of exculpatory evidence was exposed during the evidentiary proceedings before Chief Judge Navarro. The false imprisonment claim did not accrue until the dismissal with prejudice of the Underlying Action on February 7, 2018, at the earliest, and to the extent that the GOVERNMENT EMPLOYEES' ongoing restraints on Plaintiffs' liberty alleged in paragraph 96(i) and (j) of this Complaint constitute a continuing tort, the applicable limitations period is further tolled through the date of this filing.

150.    Those claims set forth herein relating to abuse of process were tolled throughout the entire pendency of the Underlying Action, as the GOVERNMENT EMPLOYEES deliberately concealed their willful and improper acts in the use of the legal process — including the Longbow Productions operation, the planting of informants, and the systematic concealment

of exculpatory evidence — from Plaintiffs until those acts were exposed during the evidentiary proceedings before Chief Judge Navarro. The abuse of process claim did not accrue until the dismissal with prejudice of the Underlying Action on February 7, 2018, at the earliest, and was further tolled by the GOVERNMENT EMPLOYEES' active and ongoing concealment of the full extent of their improper use of the legal process throughout that period.

**PRAYER FOR RELIEF COMMON TO ALL COUNTS**

WHEREFORE, Plaintiffs pray that this Court enter a judgment in their favor and against Defendant, and award as follows:

A. Monetary damages in an amount to be proven at trial;

B. Hedonic damages in favor of the Tier 1 Plaintiffs for the impairment of their future employment opportunities; and

C. All such other and further relief as the Court deems just and proper, including, without limitation, post-judgment attorneys' fees and costs.

Dated: April 8, 2026.

**JUSTICE LAW CENTER**

/s/ Bret O. Whipple
BRET O. WHIPPLE, ESQ.
Nevada Bar #6168
1100 S. Tenth Street
Las Vegas, NV  89104
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

_____ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__x___ delivery via electronic means (fax, eflex, NEF, etc.) to:


Jevechius  D. Bernardoni
Assistant United States Attorney
Jevechius.bernardoni@usdoj.gov
Attorney for the United States of America

Dated: April 8, 2026


/s/ Jeanne Metzger
An Employee of JUSTICE LAW CENTER